1

**MILSTEIN JACKSON**
**FAIRCHILD & WADE, LLP**

2

Gillian L. Wade, State Bar No. 229124

3

*gwade@mjfwlaw.com*
10990 Wilshire Boulevard, Suite 800,

4

Los Angeles, CA 90024
Phone: (310) 396-9600

5

**REESE LLP**

6

Michael R. Reese, State Bar No. 206773

7

*mreese@reesellp.com*
100 West 93rd Street, 16th Floor

8

New York, New York 10025
Phone: (212) 643-0500

9

**THE LAW OFFICE OF JACK**
**FITZGERALD, PC**

10

Jack Fitzgerald, State Bar No. 257370

11

*jack@jackfitzgeraldlaw.com*
2341 Jefferson Street, Suite 200

12

San Diego, California 92110
Phone: (619) 692-3840

13

***Counsel for Plaintiffs***

14

***(additional attorneys listed below)***

15

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

16

17

HENRY'S BULLFROG BEES, a California apiary; SAVE GOLDEN PRAIRIE HONEY FARMS, LLC, a Kansas not for profit corporation; and KELVIN ADEE d/b/a ADEE HONEY FARMS, on behalf of themselves and all others similarly situated,

18

19

20

Case No.:

**CLASS ACTION COMPLAINT FOR UNJUST ENRICHMENT AND VIOLATIONS OF:**

21

Plaintiffs,

22

v.

23

SUNLAND TRADING, INC.; LAMEX FOODS, INC.; BARKMAN HONEY, LLC; DUTCH GOLD HONEY, INC.; TRUE SOURCE HONEY, LLC; INTERTEK TESTING SERVICES, NA, INC.; and NSF INTERNATIONAL,

24

25

26

27

Defendants.

28

**1. THE RACKETEER INFLUENCED AND CORRUPT PRACTICES ACT;**

**2. THE SHERMAN ANTITRUST ACT;**

**3. THE CALIFORNIA CARTWRIGHT ACT; AND**

**4. THE CALIFORNIA UNFAIR COMPETITION LAW.**

<u>JURY TRIAL DEMANDED</u>

Plaintiffs Henry's Bullfrog Bees ("Bullfrog Bees"), SAVE Golden Prairie Honey Farms, LLC ("Golden Prairie Farms"), and Kelvin Adee doing business as Adee Honey Farms ("Adee") (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Class Action Complaint, individually and on behalf of others similarly situated, against the following defendants:

(A) <u>the Importer Defendants</u>: Sunland Trading, Inc. ("Sunland") and Lamex Foods, Inc. ("Lamex");

(B) <u>the Packer Defendants</u>: Barkman Honey LLC ("Barkman") and Dutch Gold Honey, Inc. ("Dutch Gold"); and

(C) <u>the Certifier Defendants</u>: True Source Honey LLC ("True Source"), Intertek Testing Services, NA, Inc. ("Intertek"), and NSF International ("NSF").

Based on their own personal knowledge, or upon information and belief, including the investigation of their counsel, Plaintiffs allege as follows:

## INTRODUCTION

1.     The Importer and Packer Defendants are some of the largest honey importers and packers in the United States. Certifier Defendant True Source holds itself out as a honey industry watchdog. For years, Defendants have participated in a worldwide conspiracy to defraud the United States honey market knowingly and intentionally by flooding it with fake honey that is adulterated, impure, or mislabeled, which True Source knowingly and intentionally falsely certifies as genuine.

2.     Plaintiffs are commercial beekeeping farms in the business of selling honey. Defendants' wrongful conduct has suppressed prices in the domestic honey market, making it difficult—if not impossible—for domestic commercial beekeeping farms like Plaintiffs to compete. As a direct consequence of Defendants' wrongful conduct, Plaintiffs and other Class members have suffered lost sales, lost profits, and have effectively been blocked from selling their honey in the marketplace.

1

3.     Plaintiffs bring this action on their own behalf, and on behalf of a class of domestic commercial beekeepers to recover compensation for injuries to their businesses and property caused by Defendants' knowing involvement and participation in the scheme in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), the Sherman Antitrust Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal Bus. & Prof. Code § 16720, and Unfair Competition Law, *id.* §§ 17200, *et seq.* (the "UCL"), and to enjoin Defendants' wrongful conduct.

## THE PARTIES

### Plaintiffs

4.     Plaintiff Henry's Bullfrog Bees, a sole proprietorship, is an apiary located in Winters, California engaged in the business of selling honey. Henry's Bullfrog Bees has approximately 7,600 hives.

5.     Plaintiff SAVE Golden Prairie Honey Farms, LLC is a not-for-profit honey production and beekeeping supply business located in Manhattan, Kansas. Golden Prairie Farms is part of the Servicemember Agricultural Vocation Education (SAVE) Farm program, and is a 501(c)(3) non-profit, charitable and educational corporation whose mission is to train veterans and transitioning service members, many of whom are having psychological challenges reintegrating into civilian society after war, so that they can overcome their psychological challenges through work in agriculture, and in particular, through commercial beekeeping. Golden Prairie Farms has approximately 500 beehives and maintains its own apiaries where it teaches hands-on beekeeping and harvesting of honey. Golden Prairie Farms packs the honey it produces (along with honey it purchases from other local beekeepers), for retail sale. All proceeds from the sale of Golden Prairie Farms' honey goes back into its training programs. Each winter, Golden Prairie Farms sends its beehives to California for the annual almond pollination season.

6.     Plaintiff Kelvin Adee, doing business as Adee Honey Farms, is a citizen of South Dakota and owns the country's largest domestic commercial beekeeping farm, with over 80,000 hives. Adee has operations throughout the United States, including in

2

Woodville, Mississippi and Arvin, California. Established as a honey production farm in the early 1940's, Adee Honey Farms began sending bees to California in 1990 for the annual almond pollination season, sending truck loads of honeybees across the nation every year. The farm still follows this migratory pattern, keeping the bees in the Midwest during the summer for honey production, and sending them to California in the fall, to winter them until the almonds bloom for pollination.

**The Importer Defendants**

7.     Defendant Sunland is a wholesale honey import company with its principal place of business in New Canaan, Connecticut.

8.     Defendant Lamex is a wholesale honey import company with its principal place of business in Minneapolis, Minnesota.

**The Packer Defendants**

9.     Defendant Barkman is a honey packing company with its principal place of business in either Wichita or Hillsboro, Kansas. Barkman sells its honey to retailers across the United States, including California.

10.     Defendant Dutch Gold is a honey packing company with its principal place of business in Lancaster, Pennsylvania. Dutch Gold sells its honey to retailers across the United States, including California.

**The Certifier Defendants**

11.     Defendant True Source is a trade organization with its principal place of business in Washington, D.C. True Source's Board of Directors is comprised of the following individuals:

      a.     Eric Wenger, Barkman Honey, LLC – Chair

      b.     Prakash Kejriwal, Kejriwal Group, India – Vice Chair

      c.     Jill Clark, Dutch Gold Honey, Inc. – Treasurer

      d.     Michelle Poulk, Burleson's, Inc. – Secretary

      e.     Tim Hiatt, Hiatt Honey Company

      f.     Nicholas Sargeantson, Sunland International – Executive Member

g.    Chris Olney, HoneyTree, Inc.

h.    Greg Mohr, Bee Maid Honey, Canada

i.    Normand Bernier, Odem International, Canada

j.    Javier Nascel, NEXCO S. A., Argentina

k.    Nguyen Thi Hang, HANOIBEE JSC., Vietnam

l.    Gordon Marks – Executive Director

12.    Defendant Intertek is a food testing laboratory with its principal place of business in Cortland, New York.

13.    Defendant NSF is an auditing organization with its principal place of business in Ann Arbor, Michigan.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), because Plaintiffs' claims under 15 U.S.C. § 1 (the Sherman Act), and 18 U.S.C. § 1964 (RICO) raise federal questions, and the Court has supplemental jurisdiction over Plaintiffs' claims under California state law.

15.    This Court has personal jurisdiction over Defendants because Defendants have substantial contacts with this District.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to the Court's personal jurisdiction herein. Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District.

## FACTUAL ALLEGATIONS

**I.    THE PRODUCTION AND STANDARD OF IDENTITY OF GENUINE HONEY**

17.    Genuine honey is the natural sweet substance produced by species within the *Apis* genus from the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking insects on the living parts of plants which bees collect, transform by combining with specific substances of their own, deposit, dehydrate, store, and leave in the honeycomb to ripen.

4

CLASS ACTION COMPLAINT

18.     Genuine honey consists primarily of simple sugars, predominantly fructose and glucose, as well as other substances such as organic acids, enzymes, and solid particles derived from nectar collection by bees, including pollen. The color of genuine honey varies from nearly colorless to dark brown. The consistency can be fluid, viscous, or partially to entirely crystallized. These parameters are dependent upon the botanical origin of the honey, processing, specific composition, storage temperature, and related factors. Genuine honey eventually crystallizes naturally. The flavor and aroma of genuine honey are variable, mainly depending on its botanical origin.

19.     Nectar or honeydew collected by bees must undergo a series of complicated processes in order for it to be transformed into genuine honey. This transformation occurs in the beehive, and results in the production of a stable food source for the bees that is suitable for long-term storage in the hive. Transformation of nectar or honeydew into genuine honey requires a certain amount of time, and the process is referred to as ripening.

20.     The maturation of genuine honey starts with the uptake of nectar or honeydew in the bee honey stomach while the foraging bees collect their load of nectar in the field and during their return flight. Honey maturation is inseparable from the drying process and involves the addition of enzymes and other bee substances, the lowering of pH through the production of acids in the bee stomach, and the transformation of nectar or honeydew substances. A considerable microbial population exists at the initial stages of the maturation process that can be involved in some of these transformations, such as the biosynthesis of carbohydrates.

21.     The transformation of nectar into genuine honey is the result of thousands of years of evolution by bees to achieve a long-term provision of food for their own use when there is no nectar flow from the surroundings of the colony. The reduced water content, elevated concentration of sugars, the low pH, and the presence of different antimicrobial substances, make genuine honey a non-fermentable and long-lasting food for bees.

22.     During the ripening process, bees also add enzymes including invertase, which helps to convert sucrose into the more stable simple sugars, glucose, and fructose; and

glucose oxidase, which is essential for the production of gluconic acid and hydrogen peroxide, and, in turn, prevents fermentation. As nectar is passed from bee to bee, more enzymes are added and more water is evaporated. The allocation and relocation of the content of many cells before final storage is an important part of the ripening process, and it needs sufficient space in the beehive for its normal occurrence.

23.     During this time, there are both passive and active mechanisms through which nectar dehydrates. Active dehydration occurs during "tongue lashing" behavior, when worker bees concentrate droplets of regurgitated nectar with movements of their mouthparts. By contrast, passive concentration of nectar occurs through direct evaporation of nectar stored in cells. As the nectar is dehydrated, the absolute sugar concentration rises rendering the ripening honey increasingly hygroscopic.

24.     Bees protect the mature product by sealing off cells filled with honey with a lid of wax. The ripening process concludes when capping has already started. The process of drying normally continues until the honey contains less than 18% water. Drying of honey requires ample space in the hive. During an abundant honey flow, the "honey hoarding" instinct of the bees increases if a storage space in the hive is plentiful. The time that bees need to ripen and cap honey greatly varies depending on climate conditions and the strength of the honey flow. Sufficient time in the hive and multiple manipulations by bees are thus considered necessary for the transformation of nectar into genuine honey. On average, a hive will produce about 65 pounds of surplus honey each year.

25.     The Codex Alimentarius (1981) is the internationally accepted standard for foods issued by the Food and Agriculture Organization of the United Nations ("FAO"). Based on the process described above, the Codex defines genuine honey as "the natural sweet substance produced by honey bees from the nectar of plants or from secretions of living parts of plants or excretions of plant sucking insects on the living parts of plants, which the bees collect, transform by combining with specific substances of their own, deposit, dehydrate, store and leave in the honey comb to ripen and mature," which "shall

1  not have added to it any food ingredient, including food additives, nor . . . any other
2  additions . . . than honey."[1]

3      26.    The Codex definition has been accepted by Apimondia, the International
4  Federation of Beekeepers' Associations founded in 1897,[2] the United States Department of
5  Agriculture ("USDA"),[3] and by the Food and Drug Administration ("FDA").[4] In 2020, the
6  United States Pharmacopeia also proposed a new FCC Identity Standard that tracks this
7  same definition.

8  **II.   THE    UNITED    STATES'   HONEY    MARKET    SUFFERS    FROM**
9  **ECONOMICALLY-MOTIVATED ADULTERATION**

10     27.    Honey is popular in the United States, with annual sales of over $8 billion, and
11  annual consumption of over 1.5 pounds per person, which has doubled since the 1990s.

12     28.    The United States honey market includes beekeepers, like Plaintiffs Bullfrog
13  Bees, Golden Prairie Honey Farms, and Adee; honey importers, like Defendants Sunland
14  and Lamex; honey packers, like Defendants Barkman and Dutch Gold; and honey certifiers,
15  like Defendants True Source, Intertek, and NSF.

---

[1]   Codex Alimentarius (1981), Codex Standard for Honey, *available at* www.fao.org/input/download/standards/310/cxs_012e.pdf.

[2] Apimondia Statement on Honey Fraud (January 2020), *available at* https://www.apimondia.com/docs/apimondia_statement_on_honey_fraud_v_2.pdf (quoting Codex Alimentarius (1981)).

[3] *See* USDA Commercial Item Description: Honey § 6.1.1, *available at* https://www.ams.usda.gov/sites/default/files/media/AA20380_Honey.pdf (describing the "salient characteristics" of honey as "a sweet, syrupy substance produced by honey bees from the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking insects on the living part of plants, which the bees collect, transform by combining with specified substances of their own, deposit, dehydrate, store, and leave in the honeycombs to ripen and mature.").

[4] *See* Guidance for Industry: Proper Labeling of Honey and Honey Products (March 2018), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-proper-labeling-honey-and-honey-products (citing CODEX Standard for Honey CODEX STAN 12-1981).

7

CLASS ACTION COMPLAINT

29.     Packers purchase honey directly from domestic beekeepers, or purchase honey from importers who purchase it from foreign producers. Packers then package and distribute honey to retailers under various brand names.

30.     Over the last several years, global production of honey has been steadily decreasing, including in the United States. While the number of hives has remained relatively stable, their yield has dropped drastically due to a variety of factors, including climate change, natural disasters, neonicotinoids, pesticides, mites, colony collapse disorder, reduction of acreage for forage, monodiets, stress, and environmental pollution. For example, while the number of beehives increased about 8%, the average honey yield declined by 37% between 2007 and 2014.

31.     Despite significant reductions in hive yield and productivity, however, honey exports, imports, and total supply have increased over the same time.

32.     Economically-motivated adulteration is the fraudulent, intentional substitution or addition of a substance to a product for the purpose of increasing its apparent value or reducing its cost of production for economic gain.

33.     Given the high and continually-growing consumer demand for genuine honey, and simultaneous decline in supply of genuine bee-made honey, there is strong economic motivation for the production of and passing-off as genuine honey non-honey syrups known as "honey product."[5] Honey product is, essentially, "fake honey" and will be referred to throughout this Complaint as "fake honey."

34.     Despite what should be a clear seller's market, domestic commercial beekeepers that produce genuine bee-made honey, like Plaintiffs, are unable to sell their genuine honey at all, or must sell it at a substantial loss, due to the increased competition from cheaper, imported fake honey.

---

[5] "Honey product" was defined in 1996, and again in 2003, to refer to products that "do not meet the compositional criteria for honey; but are products consisting in whole or in part of honey." National Honey Board, "Definition of Honey and Honey Products," *available at* https://www.bjcp.org/mead/honeydefs.pdf.

35.     Over the past ten years, global honey imports increased by about 34%, from about 550,000 tons in 2010, to about 730,000 tons in 2019. During this period, the 10 main honey-exporting countries in the Americas (Argentina, Brazil, Canada, Mexico, Chile, Uruguay, Cuba, El Salvador, Guatemala, and Nicaragua) increased their total honey exports by only 6.5%, while the 10 main honey-exporting countries in the Eastern Hemisphere (China, India, Ukraine, Vietnam, Thailand, Turkey, Pakistan, the Russian Federation, Taiwan, and Myanmar) have increased their total honey exports by 95.8%.[6]

36.     The increased production of honey abroad is <u>not</u> due to an increase in the number of hives. Rather, these countries have flooded the market with low-priced and low-quality products exported under the name of "honey" that are not, in fact, genuine honey. As a result, the global honey market, including the United States' honey market, suffers from widespread economically-motivated adulteration, with the markets now overrun with fake honey being passed off as genuine, bee-made honey.

37.     There are several indicia of this adulteration. First, there is more honey being sold each year than existing bee populations are capable of producing.

38.     Second, the global market is seeing increases of honey production from areas in which it is not possible. For example, although India does not have the climate or the floral sources to produce large volumes of white and extra light amber honey, its exports of these high-demand, premium honeys have steadily increased in recent years.



---

[6] Evaluation of the Direct Economic Impact of Decreasing Prices of Honey on the Main Honey Export Countries of the Americas. Apimondia, *available at* https://www.apimondia.com/docs/commissions/decreasing_prices_honey_americas.pdf.

CLASS ACTION COMPLAINT

39.     Third, testing by a variety of entities, including the European Commission and Canadian government, show that much of the honey on retail shelves is not genuine honey. The European Commission's testing and analysis, for example, showed that, of 2,264 honeys tested, only 39.4% were compliant with the Apimondia standard for honey.

40.     Fourth, although the cost of genuine honey production has substantially increased due to the added cost of preserving bee populations and overcoming colony losses, so that economics would indicate a higher market price for sellers, honey prices have actually decreased overall.



41.     According to the Apimondia's January 2020 Statement on Honey Fraud, honey is the third-most adulterated food in the world.[7] One expert recently estimated that as much as 50% of honey in the market is not genuine.[8]

42.     Temptations for honey adulterators have increased in recent years because of the higher prices of genuine honey compared to fake honey, and the obsolescence of official methods to detect instances of fraud. The policing of fraud in relation to honey is challenging and infrequent, making the opportunity attractive to those who wish to commit

---

[7] Apimondia Statement on Honey Fraud, Apimondia (January 2020), *available at* https://www.apimondia.com/docs/apimondia_statement_on_honey_fraud_v_2.pdf.

[8] Ron Phipps, International Honey Market Report, Am. Bee J. (June 2020).

CLASS ACTION COMPLAINT

fraud. Some examples of common modes of production and processing that violate the Codex and result in an adulterated, fake honey are as follows:

**Table 1.**

| PRACTICE | HOW IT COMPROMISES THE INTEGRITY OF GENUINE HONEY |
|---|---|
| Harvesting of immature honey as a systematic and purposeful mode of production. | Bees have insufficient time to mature honey and add specific substances of their own by multiple manipulations. As such, the transformation of nectar into genuine honey is never completed and thus, the product cannot be called honey, and is, as described in the Complaint, "fake honey." |
| Artificial feeding of bees during a nectar flow, or in place of nectar flow. | Genuine honey should only be produced by honeybees from the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking insects on the living parts of plants. |
| Adulteration, with sugars, sweeteners, and syrups. | Nothing should be added to the genuine honey (including substances that are contained naturally in genuine honey). |
| Dehydration of extracted immature honey with technical devices. | Moisture reduction of immature honey is an inseparable part of the maturation process and should be done exclusively by bees. |
| Use of Ion-Exchange Resins to remove residues, offensive aroma, indicators of quality such as 5-hydroxymethylfurfural (HMF), and lighten the color of honey. | Genuine honey should not be processed to such an extent that its essential composition is changed and/or its quality is impaired. No pollen or constituents particular to genuine honey may be removed. |
| Pollen addition to honey. | Any additions of pollen to genuine honey through whatever means, which are for the purposes of concealing the origins of honey (including those substances that are contained naturally in honey) can be used to obfuscate the honey authenticity detection process. |

11

CLASS ACTION COMPLAINT

| PRACTICE | HOW IT COMPROMISES THE INTEGRITY OF GENUINE HONEY |
|---|---|
| Heating. | Some genuine honeys are heated to high temperatures, for easier manipulation and to avoid crystallization, but are presented as "raw." When heating honey to high temperatures, *i.e.*, 105 degrees or more, the enzymes naturally found in honey decrease or vanish altogether and should not be called "raw honey." |

43.     Honey imported from overseas is often adulterated—either by having sugars added to it or by being cleaned, heated, or filtered—and then is blended with small amounts of genuine honey until the sticky, fake honey product is uniform.

44.     Fake honey that largely consists of cheap sugars processed to have the appearance and consistency of honey has driven global honey prices into the ground, leaving domestic commercial beekeepers, like Plaintiffs, who produce real bee-made honey, unable or only barely able to sell genuine honey for a profit. As a result of Defendants' conduct, Plaintiffs and all other similarly-situated domestic commercial beekeepers who produce and sell genuine honey are on the brink of financial collapse, and the world at large faces the catastrophic implications of a bee shortage that could eradicate the world's food supply.

## III.    THE DETECTION OF ADULTERATED HONEY

45.     Various methods of testing have been developed to detect honey adulteration (in other words, to distinguish between genuine honey and fake honey).

46.     Elemental Analysis Isotope Ratio Mass Spectrometry ("EA/LC-IRMS"), developed over 25 years ago, has been the traditional method of honey adulteration detection. EA/LC-IRMS detects C4 sugars in honey. True honey comes from flowering plants which produce C3 sugars, but honey diluted with artificially manufactured syrup, like corn syrup, shows traces of C4 sugars, which render it fake honey.

47.     While EA/LC-IRMS was the original standard for honey fraud detection, the recent use of other syrups made from C3 plants to adulterate honey, mainly from rice, has

CLASS ACTION COMPLAINT

made the detection of fraud much more difficult, since these adulterants are undetectable by EA/LC-IRMS. This makes EA/LC-IRMS largely ineffective at detecting most newer methods of honey adulteration.

48.     One of the more promising tools in the detection of food adulteration is nuclear magnetic resonance ("NMR") testing. This technique can measure differing compounds and allow thorough examination of the structural information of compounds contained in a honey sample to determine if it is genuine honey or fake honey. NMR tests for the presence and absence of 36 major components within honey and has the biggest database of any scientific methodology applied to honey. NMR testing can simultaneously:

      a.     Detect the addition of exogenous sugars (from whatever source: cane, corn, beet, wheat, rice, etc.);

      b.     Confirm the floral origin of honey declared on a product's packaging (single-flower honeys);

      c.     Detect irregularities, such as excessive heat treatment (determination of 5-HMF) or fermentation; and

      d.     Quantify the main sugars (glucose, fructose, sucrose).

49.     The development and application of NMR to the analysis of honey authenticity is ongoing, through collaboration between private, government, and academic laboratories.

## IV.   DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES' HONEY MARKET

### A.     Industry Members Create True Source in 2010, Purportedly to Address Honey Adulteration

50.     For some time, there has been increasing public attention on honey adulteration and fraud. In 2010, four North American honey packers and importers, including defendant Dutch Gold, launched the Honest Honey Initiative and "pledged to help

CLASS ACTION COMPLAINT

protect the quality and reputation of the U.S. honey supply, as well as the sustainability of U.S. beekeepers and honey businesses."[9]

51.     A few months later, the name was changed to True Source Honey, as explained by Jill Clark, of Dutch Gold: "Initially we launched this initiative purely as an educational effort, but due to interest by the industry we feel the need to develop a name that can be trademarked for broader use . . . . Honest honey was not available for trademark use, so we've moved to True Source Honey™, a name which works even better in calling attention to the need for true and legal sourcing of this valuable food." [10]

52.     Ms. Clark also explained the goals of True Source as follows:

> When honey is imported illegally, no-one can be confident of its true source and quality. Some products are not 100% honey and have other quality issues[.] . . . We're asking people who buy and love honey to find out more about how the honey they enjoy is sourced. By raising awareness of unfair trade practices and taking the True Source Honey pledge, we hope to protect consumers and manufacturers who use honey, and to preserve the fair honey trade. . . . We estimate that millions of pounds of Chinese honey continue to enter the U.S. from countries that do not have commercial honey businesses[.] . . . For example, countries such as Indonesia, Malaysia, Taiwan, Thailand, the Philippines and Mongolia raise few bees and have no history of producing honey in commercial quantities, yet have recently exported large amounts of honey to the United States.[11]

53.     In November 2010, True Source announced a certification program, "True Source Certified," which it stated was "designed to certify the origin, food safety and purity

---

[9] "'Honest Honey' Launched to Protect U.S. Honey Consumers and Customers" (May 6, 2010), *available at* https://truesourcehoney.com/newsroom/release_050610w.php.

[10] "'Honest Honey' Changes Name to 'True Source Honey™' To Clarify Goal of Protecting U.S. Honey Consumers and Customers" (July 15, 2010) ["Honest Honey Changes Name"], *at* https://truesourcehoney.com/newsroom/release_071510w.php.

[11] *Id.*

CLASS ACTION COMPLAINT

of the honey being distributed and consumed within North America."[12] The program provides a traceability system for participants who wish to demonstrate through an independent, third-party audit that their sourcing practices are in compliance with requirements of the True Source Certified Standard. This traceability system is designed to allow honey to be tracked from the consumer, back through the supply chain, to the country of origin and the beekeeper who harvested the honey from the beehive.

54.     True Source Certified purports to ensure the traceability and authenticity of honey at each stage in the supply chain. Participants of True Source Certified are required to comply with specific standards (the "True Source Certified Standard").[13] Generally: (1) participating beekeepers are required to produce and sell authentic honey directly from their own operations; (2) certified processors/exporters are required to purchase honey only from participating beekeepers; (3) participating importers are required to purchase honey only from certified processors/exporters; and (4) certified packers are required to purchase honey only from certified processor/exporters, registered importers, and registered beekeepers.

55.     <u>Participation for Beekeepers</u>. "Beekeeper," as defined under the True Source Certified Standard, refers to the "[p]rimary producer with direct ownership or control of honey production."[14] In order to be registered with True Source as participating members, beekeepers must produce and sell authentic honey directly from their own operations; must follow all applicable laws pertaining to the production, sale, and/or export of honey; and

---

[12] "True Source Honey Will Launch Certification Program To Help Stem the Tide of Illegal Honey" (November 12, 2010), *available at* https://truesourcehoney.com/newsroom/release_111210.php.

[13] True Course Certified® Standards V6.1 (January 1, 2021), *available at* https://truesourcehoney.com/true-source-certified/standards-2021-01-01.pdf ["2021 True Source Standards"].

[14] *Id.*

CLASS ACTION COMPLAINT

must ensure that each load sold is accompanied by a bill of lading with the beekeeper and purchaser's name and address, drum count, and weight.[15]

56. <u>Certification for Processors/Exporters</u>. "Processor/Exporter," as defined under the True Source Certified Standard, refers to a "company located outside the United States that operates a bulk plant/factory for purposes of preparing honey for export."[16] In order to be True Source Certified, processors/exporters are required to establish a system of traceability; clearly label all individual drums of honey with certain information (including country of origin); seal each load of honey with the True Source Certified Seal and True Source Seal Number, which is assigned by True Source to each full ocean container load or full truckload of honey exported by certified processors/exporters; maintain and attach to the True Source Certified Seal Database[17] certain export documentation (including ocean/truck bills of lading and analysis reports on the honey's origin and authenticity); and participate in a third-party certification audit and an annual recertification audit (among other things).[18]

57. The third-party certification audit for processors/exporters involves several key components:

    a. Evaluating the processor/exporter's system of traceability;

    b. Collecting random samples of unprocessed honey inventory to test for country of origin and authenticity using pollen analysis;

    c. Confirming that the processor/exporter is not using processing equipment or technology that changes the fundamental composition of honey (e.g., the use of resin technology); and

---

[15] *Id.*

[16] *Id.*

[17] The True Source Certified Seal Database is True Source's data entry system verifying each link of the supply chain through seal reconciliation.

[18] 2021 True Source Standards.

CLASS ACTION COMPLAINT

d.      Confirming that the processor/exporter maintains and demonstrates a system to ensure honey authenticity.[19]

58.    Once a honey packer is True Source Certified, it is subject to an annual announced surveillance (recertification) audit.[20]

59.    True Source Certified processor/exporters are required to purchase honey only from True Source participating beekeepers.

60.    <u>Participation for Importers</u>. "Importer," as defined under the True Source Certified Standard, refers to a "company that purchases honey from a processor/exporter and is responsible for (1) ensuring the imported goods comply with local laws and regulations, (2) filing a completed duty entry and associated documents, and (3) paying the assessed import duties and other taxes on those goods and then selling the honey to packers."[21] In order to be registered with True Source as participating members (and obtain a "certificate of participation"), honey importers are required to:

a.      Purchase honey from "Approved Countries";

b.      Maintain the True Source Certified Seal Database; and

c.      Maintain and attach to the True Source Certified Seal Database certain required documents, including ocean/truck bills of lading (which must contain True Source seal numbers) and analysis reports on the honey's origin and authenticity.[22]

61.    Importers that are participating members of True Source must buy only from True Source Certified processor/exporters and sell only to True Source Certified packers.[23]

62.    Defendants Sunland and Lamex are participating members of True Source.

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

63.     <u>Certification for Packers</u>. "Packer," as defined under the True Source Certified Standard, refers to a "company in North America that is involved in purchasing, blending, processing and repackaging raw honey in preparation for the retail, wholesale or bulk ingredient market."[24] In order to be True Source Certified, packers are required to:

a.      Ensure their honey sourcing comes from True Source participants, i.e., certified processor/exporters, registered importers, and registered beekeepers;

b.      Purchase honey from certain "Approved Countries";

c.      Maintain a system of traceability;

d.      Maintain the True Source Certified Seal Database;

e.      Maintain documentation for every purchase shipment of raw honey (e.g., ocean/truck bills of lading, which must contain the True Source Certified seal number, and analysis reports on the honey's origin and authenticity);

f.      Allow entry to an audit firm for unannounced sampling; and

g.      Successfully complete certification an audit by a third-party audit firm.[25]

64.     The third-party certification audit for packers involves several key components:

a.      Evaluating the packers' system of traceability;

b.      Confirming that each load purchased and imported has an associated True Source Certified seal number;

c.      Collecting random samples of unprocessed honey inventory to test for country of origin using pollen analysis;

d.      Confirming that the packer is not using processing equipment or technology that changes the fundamental composition of honey (e.g., the use of resin technology); and

---

[24] *Id.*

[25] *Id.*

CLASS ACTION COMPLAINT

e.      Confirmation that the packer maintains and demonstrates a system to ensure honey authenticity.[26]

65.    Once a honey packer is True Source Certified, it is subject to an annual announced surveillance (recertification) audit.[27]

66.    True Source Certified packers are required to purchase honey only from True Source participating importers, certified domestic beekeepers and certified processors/exporters.

67.    Defendants Barkman and Dutch Gold are True Source Certified packers.

68.    True Source Certified was launched in January 2011.[28] As an integral part of the certification process, True Source engages third party testers and auditors, including Intertek and NSF, directing them to conduct audits of True Source Certified honey packers and their supplying beekeepers located within the state of California.[29] For example, upon

---

[26] *Id.*

[27] *Id.*

[28] "True Source Honey Launches Certified Honey Traceability Program To Protect Honey Consumers and Customers" (January 11, 2011) ["Certified Honey Traceability Program"], *available at* https://truesourcehoney.com/newsroom/release_011111.php.

[29] *See, e.g.,* https://truesourcehoney.com/made-with/made-with-true-source-honey.pdf ("The True Source Certified program provides audits by NSF, an internationally recognized third party audit firm that certifies the source of honey from hive to manufacturer. And, it requires honey packers and exporters to maintain a system to analyze honey purity."); *see also* 2021 True Source Standards at 7 ("An independent audit firm has been contracted by True Sources Honey LLC to manage the certification and auditing of True Source Certified"); *id.* ("Packers, Co-Packers and Processor/Exporters" subject to "[a]n annual scheduled Annual audit"); *id.* at 13-31 ("Certification for Packers" and "Certification for Processor/Exporters" both include an extensive audit process, wherein auditors "visit[] [ ] randomly selected Beekeepers" to check compliance, and importers of honey need to maintain the True Source Certified Seal Database with required documentation, including relevant laboratory testing reports, country of origin certification, and sometimes local sampling reports issues by the audit firm); *id.* at 32 ("The True Source Certified® logo is for use by True Source Certified® members only who have successfully completed a True Source Certified® audit."). Beekeepers selected to participate in a packer audit must allow

CLASS ACTION COMPLAINT

launching True Source Certified, True Source announced that, "For those applying for certification, Intertek will conduct unannounced inspections, review documents and collect samples for country-of-origin verification."[30]

69.   Testing and audits undertaken by Intertek and NSF are conducted in such a way as to conceal evidence of adulteration. For example, Intertek has traditionally used only the outdated and ineffective EA/LC-IRMS testing method, which is incapable of detecting all methods of honey adulteration and fraud, instead of the more sophisticated NMR testing, to test honey samples for the purpose of awarding of the True Source certification.

70.   Moreover, Intertek conducted a series of inspections that revealed evidence indicating that the Importer and Packer Defendants' "honey" was fake—not genuine—but allowed the True Source Certified Seal to be applied to these fake "honey" products anyway, allowing the Importer and Packer Defendants to sell this fake honey as genuine.

71.   The True Source Certified Seal has been applied to the Importer Defendants' and the Packer Defendants' fake "honey" products, which have been distributed and sold throughout the United States, including in California, which True Source knows in approving such products to bear its certification seal.

---

auditors to inspect facilities and records to verify the beekeeper has enough hives to support the volume of honey sold. *Id.* at 27-28. Such California beekeepers include at least the following: A & Bee Provisions; Arrowsmith & Sons Apiaries; Ashurst Honey Co.; Bee-lieve Apiary LLC; Bloom Honey, LP; Brock Ashurst Bees; BWB Honey Company; Cary's Honey Farms, Inc.; Chavinda HoneyBee Farms Inc.; Colony & Keeper; Delgado's Bee Farm; Dion Ashurst Farms; Eli Figueroa's Bee Service; Elsi Bees; Fairview Honey; Foothills Honey Company; Glory Bee Co. LLC; Godlin Bees, Inc.; Gonzalez Apiaires; Inland Bees Inc.; Island District Honey Company; Jaynes Honey Co.; Jim's Honey Farm LLC; John Bradley; Lee Parrish Beekeeping; Lucian Nastase; M & M Apiary LLC; Marquette Bees, Inc.; Matthew T Sheilds; McWilliams Honey Company; Mickey Bee LLC; Norcalbees; Olivarez Honey Bees; Palmer Honey Company; Reynaga Apiaries; Royal Honey; Russell Allen; Sage Mountain Apiaries; Sample Family Apiaries; Soffel Farms Inc.; Steve Blair; Steve E Park Apiaries; Strachan Apiaries, Inc.; T & B Apiaries; Tim Fenston; Traveling Honey Bee's Inc.; Travis Soffel; Ubees California LLC; UHB, LLC; West Apiaries; and Wonderful Bees. *See* http://www.tshmember.com/beekeepers.php.

[30] Certified Honey Traceability Program, *supra* n.28.

CLASS ACTION COMPLAINT

72.    True Source certifies honey packers in California[31] and issues certificates of participation to participating honey importers in California,[32] knowing those companies' products will be and are directed at California consumers while bearing the True Source Certified Seal.

73.    True Source encourages, intends for, and knows that the True Source Certified honey packers (including the Packer Defendants) use their certification seals to engage in marketing efforts within the State of California. Indeed, True Source Honey chose its name expressly because its original choice was unavailable for Trademark registration and it wanted to "develop a name that can be trademarked for broader use . . . ."[33]

74.    True Source strictly controls the use of its True Source Certified Seal, including in "Retail markets," providing detailed "guidelines [that] must be strictly observed when using the True Source Certified® logo."[34] True Source claims that the True Source Certified Seal may only be applied to products which are 100% pure, genuine honey.

75.    True Source also promotes itself to major retailers throughout the country and California, touting its certification program and encouraging retailers to purchase only honey that has been True Source Certified. As a result of its efforts, many retailers, including Costco, have adopted a policy of buying only True Source Certified honey.

**B.    True Source's Scheme to Defraud**

76.    Although it purports to be a watchdog of the honey industry, True Source in fact regularly and intentionally fails to monitor its members for actual compliance with the

---

[31] California True Source certified packers include at least True Gold Honey, Inc. *See* http://www.tshmember.com/packers.php.

[32] California True Source certified importers include at least BCD Foods, Impex Group, Ortega's Ultimate Trading, Toshuku America, Inc., and True Minh Inc. *See* http://www.tshmember.com/importers.php.

[33] Honest Honey Changes Name, *supra* n.10.

[34] *See* 2021 True Source Standards at 31-37.

True Source Certification Program requirements, and has regularly and intentionally failed to implement its testing protocol as described above, in an effort to increase its profits and those of its honey packer and importer members, including Defendants.

77.     Faced with increasing press coverage of honey fraud and mounting industry pressure about proper testing of honey imports, on December 14, 2020, True Source issued a self-serving press-release-style advertisement in the American Bee Journal stating it was "updating its certification standards in 2021" to test authenticity of imported honey "by an accredited laboratory at some point in the supply chain using either EA/LC-IRMS and Nuclear Magnetic Resonance (NMR) profiling or EA/LC-IRMS and High Resolution Mass Spectrometry (HRMS) analysis."[35] The ad goes on to quote Gordon Marks, the executive director of True Source, as saying that "The new standards specify authenticity testing which utilizes longstanding approved methods along with cutting-edge technologies to detect sugars/syrups."[36]

78.     Contrary to the advertisement, however, for over a decade, True Source has downplayed the importance of the "cutting edge" NMR testing, and its members, including Gordon Marks, have publicly stated that NMR testing is not necessary or superior to other forms of testing known to be inaccurate, like EA/LC-IRMS. While NMR is effective at detecting adulteration and fraud, EA/LC-IRMS is easy to circumvent.

79.     True Source has long discounted more effective testing methods like NMR because True Source does not want its fraud revealed, since more accurate methods are able to show that the honey it is certifying is fake honey. Moreover, True Source is aware that its certified members can manipulate, and in many instances have manipulated, the findings of an NMR test by requesting that the testing/auditing companies (*i.e.*, Intertek and NSF) test only certain components that would allow their honey to pass muster, while foregoing a

---

[35] "True Source Honey to Update Certification Standards in 2021" (Dec. 14, 2020) ["Update to Certification Standards"], *available at* https://americanbeejournal.com/true-source-honey-to-update-certification-standards-in-2021.

[36] *Id.*

CLASS ACTION COMPLAINT

comprehensive analysis that would produce a full NMR profile and conclusively detect fraud.[37] Intertek and NSF are fully aware this kind of partial NMR testing allows honey fraud to go undetected.

80.     True Source's knowledge of the ongoing fraud in the honey industry is summed up by Gordon Marks himself: "While most honey comes from high-quality, legal sources, adulterated honey and illegally sourced honey remains a global issue that undercuts fair market prices and damages honey's reputation for quality and safety."[38]

81.     True Source, in conjunction with Intertek and NSF, has certified and continues to certify certain honey packers, including the Packer Defendants, as well as exporters of adulterated honey, as True Source Certified, and has issued and continues to issue certificates of participation to participating importers, including the Importer Defendants, even though True Source is aware they do not meet the articulated standards for True Source Certification and Participation.

82.     True Source is fully aware its Certification and Participation program is being used by honey packers and importers (including the Importer Defendants and Packer Defendants) to misrepresent the authenticity of their honey products, and has allowed them to use the True Source Certified Seal to mislead businesses and consumers into believing their honey is genuine, when it is not.

83.     Intertek and NSF are fully aware that their testing and audits are woefully inadequate to detect all methods of honey adulteration and fraud and are being used to fabricate the authenticity of the Importer and Packer Defendants' "honey" products.

84.     In furtherance of Defendants' conspiracies and schemes, True Source, in conjunction with Intertek and NSF, engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, by using or

---

[37] As noted in paragraph 48 above, NMR tests for the presence and absence of 36 components within honey to determine its authenticity.

[38] Update to Certification Standards, *supra* n.35.

CLASS ACTION COMPLAINT

causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to assist in the repeated, systematic, and fraudulent distribution and sale of fake honey to businesses and persons throughout the United States.

85.     Specifically, in furtherance of the scheme, True Source, Intertek, and NSF created, maintained, and transmitted through the mail and wires fake and fraudulent papers to misrepresent fake honey as genuine.

## C.     The Importer Defendants' Scheme to Defraud

86.     The Importer Defendants are some of the largest honey importers in North America. Each of the Importer Defendants is a participating member of True Source.[39]

87.     The Importer Defendants hold themselves out as honest dealers in the honey industry, committed to ensuring the authenticity of their honeys.

88.     Sunland represents that its "imports are meticulously controlled for quality and traceability, with suppliers vetted in accordance with FDA guidelines and our own exacting standards," and that, "As a member of True Source Honey, Sunland is involved in leading the honey industry's efforts to protect the reputation of legitimately imported honey."[40]

89.     Lamex claims its "sources are up to welfare, traceability, quality, and nutrition standards demanded by consumers."[41]

90.     Despite these claims, the Importer Defendants have engaged in a fraudulent scheme to import fake honey into the United States, knowingly importing honey manufactured using one or more of the processes described above in **Table 1**, thereby rendering the finished product a fake honey product.

---

[39] *See* Rising Tide of Honey Laundering, Descartes Datamyne (November 18, 2011), *available at* https://www.datamyne.com/blog/data-applications/rising-tide-of-honey-laundering; *see also* Participating Importers, True Source, *available at* http://www.tshmember.com/importers.php.

[40] http://www.sunlandhoney.com.

[41] https://tinyurl.com/y5ebdn95.

CLASS ACTION COMPLAINT

91.     The Importer Defendants have used and continue to use the True Source Certified Seal to falsely convey the authenticity of their fake honey products as genuine honey.

92.     The Importer Defendants knowingly, intentionally, and repeatedly conspired with True Source and the Packer Defendants to introduce fake honey into the United States' honey market.

93.     The Importer Defendants know their honey products are fake, based in part on the artificially lower price of exported honey they purchase in comparison with the fair price of genuine honey that domestic beekeepers have attempted, without success, to charge.

94.     In furtherance of Defendants' conspiracies and schemes, the Importer Defendants engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, by using or causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute and sell fake honey to packers and other businesses throughout the United States.

95.     The Importer Defendants have actively concealed their repeated, systematic, and fraudulent distribution and sale of fake honey by creating, maintaining, and transmitting through the mail and wires fake and fraudulent bills of lading, invoices, packing lists, and other papers to falsely and fraudulently represent fake honey products as genuine.

**D.     The Packer Defendants' Scheme to Defraud**

96.     The Packer Defendants are some of the largest honey packers in North America and sell honey directly to retailers, in direct competition with Plaintiffs. Each of the Packer Defendants is True Source Certified.[42]

97.     The Packer Defendants hold themselves out as honest dealers in the honey industry, committed to ensuring the authenticity of their "honey."

---

[42] http://www.tshmember.com/packers.php.

CLASS ACTION COMPLAINT

98.   Barkman states that all of its "honey" "is True Source Certified and fully traceable back to its origin. For us, it's a badge of honor. For you, it's peace of mind."[43]

99.   Dutch Gold states that it "is True Source Certified to protect our customers and consumers by ensuring to our utmost ability that honey is ethically sourced in a transparent and traceable manner from known beekeepers and brokers; that honey moves through the supply chain in full accordance with U.S. law and without circumvention of trade duties; that it carries truthful labeling as to its source, has been tested to ensure quality, and has been handled in a safe and secure manner from hive to table."[44]

100.   Despite these claims, the Packer Defendants have engaged in a fraudulent scheme of knowingly and intentionally purchasing fake honey from unscrupulous importers, and blending, processing, and repackaging such fake honey with honey produced by Plaintiffs and other domestic commercial beekeepers, for sale in the retail market.

101.   The Packer Defendants have used and continue to use the True Source Certified Seal to falsify the authenticity of their supposed "honey."

102.   The Packer Defendants knowingly, intentionally, and repeatedly conspired with the Certifier Defendants and the Importer Defendants to introduce fake honey into the United States' honey market.

103.   In furtherance of Defendants' conspiracies and schemes, the Packer Defendants engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by using or causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to repeatedly, systematically, and distribute fake honey to retailers and other businesses throughout the United States.

104.   Specifically, to hide their malfeasance and further the scheme, the Packer Defendants created, maintained, and transmitted through the mail and wires fake and

---

[43] http://www.barkmanhoney.com/about/our-promise.

[44] https://dutchgoldhoney.com/about-us/#certifications.

fraudulent bills of lading, invoices, packing lists, and other papers to falsely and fraudulently represent fake honey at genuine.

## V.   DEFENDANTS' SCHEME HARMED THE MARKET AND INJURED PLAINTIFFS AND OTHER DOMESTIC COMMERCIAL BEEKEEPERS

105.   By conspiring to import and sell fake honey as genuine honey, Defendants have caused great harm to the market for honey, and to Plaintiffs and other domestic commercial beekeepers ("Class Members").

106.   Defendants caused fake honey to enter the United States' honey market at substantially lower market prices than the genuine honey produced and sold by Plaintiffs and other Class Members, putting them in a position where they could not compete with Defendants. Because the demand for genuine honey is higher than the available supply, had Defendants not engaged in the acts of fraud alleged herein, packers and retailers would have had to purchase genuine honey from honest beekeepers, including Plaintiffs and other Class Members, in order to meet consumer demand without resorting to buying fake honey.

107.   It was a foreseeable and natural consequence of Defendants' fraudulent conduct and scheme to obtain greater sales for themselves, that Plaintiffs and other Class Members would sell less genuine honey and/or be forced to sell their genuine honey at prices significantly below what a fair market price would be absent Defendants' wrongful and unlawful conduct.

108.   As a direct and proximate result of Defendants' wrongful and unlawful conduct, Plaintiffs and other Class Members lost genuine honey sales to Defendants, or had to sell their genuine honey at deeply-discounted prices, eliminating or severely impeding their ability to make a profit, in order to compete with Defendants. Additionally, Golden Prairie Farms has been unable to adequately sustain its benevolent and therapeutic training mission.

109.   Plaintiffs and other Class Members thus suffered immediate injury to their businesses and property in the form of, *inter alia*, lost sales and profits.

110.   For example, Plaintiff Bullfrog Bees is unable to get a fair price for the genuine honey it produces and cannot even break even, *i.e.*, sell its honey for its cost of production. As a result, Bullfrog Bees has been forced sell its genuine honey only to local retailers, leaving it without the ability to grown the number of hives it maintains, increase the amount of honey it produces, or otherwise grow its business.

111.   Similarly, despite its long-term budget and business planning being based on its expectation of obtaining a fair market rate for its genuine honey, Golden Prairie Farms is unable to compete with the low price at which Defendants are able to sell their fake honey, and, as a result of Defendants' wrongful and unlawful conduct, cannot even break even when selling its honey. This is because nearly every mass retailer in the United States, including Kroger, Walmart, Trader Joes, and Ralphs, is unwilling to pay a fair price for Golden Prairie Farms' honey and has refused to do business with Golden Prairie Farms because the price of its genuine honey is too high compared to Defendants' fake honey.

112.   Moreover, Adee—the largest honey production farm in the country—has been forced to sell its genuine honey at a substantially lower price than break even, and often cannot sell its honey *at all*. Given that genuine honey production is down and consumer demand and consumption is up, Adee should have no problem selling its honey, and for a fair price. Yet Adee is storing over *6 million pounds* of honey it has been unable to sell because Defendants simply will not buy it. Nor are Defendants forced to buy Adee's genuine honey when they can instead purchase fake honey that is True Source Certified.

113.   There is a direct causal relationship between Defendants' fraudulent importing, false certification as genuine, and selling of fake honey, and their attaining a superior competitive position in the market vis-à-vis Plaintiffs and other Class Members, with the latter suffering the above-described economic damages.

## CLASS ALLEGATIONS

114.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of a Class of all domestic commercial beekeepers that have produced and/or sold honey in the United States within the four years preceding the filing of this Complaint (the

"Class"). Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment to the Complaint or in a motion for class certification.

115.  Class Members were uniformly impacted by Defendants' misconduct. Accordingly, this Complaint is suitable for class-wide resolution.

116.  This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(l)-(4) and 23(b)(l), (b)(2) or (b)(3), and satisfies the requirements thereof. If appropriate, Plaintiffs may also seek certification of specific issues pursuant to Fed. R. Civ. P. 23(b)(4).

## I.   RULE 23(A) REQUIREMENTS

117.  The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

118.  **Numerosity**: The proposed Class is so numerous that joinder of all members would be impracticable.  While the exact number of Class Members is unknown at this time, Plaintiff believes the Class is comprised of at least several thousand domestic commercial beekeepers.

119.  **Typicality**: Plaintiffs' claims are typical of the claims of other Class Members' claims. Plaintiffs and other Class Members sustained and continue to sustain damages arising out of Defendants' conduct in violation of the laws alleged herein.

120.  **Adequacy of Representation**: Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them and the Class. There are no conflicts between Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

121.  **Commonality**: There are numerous and substantial questions of law and fact common to all Class Members sufficient to satisfy Rule 23(a), which control this litigation

and predominate over any individual issues for purposes of Rule 23(b)(3). Included within these common questions are the following:

      a.    Whether the Importer Defendants imported fake honey into the United States for purchase by businesses and other persons in the United States;

      b.    Whether the Packer Defendants engaged in the repackaging and distribution of fake honey for sale in the retail market;

      c.    Whether the Certifier Defendants falsely certified the fake honey sold by the Importer Defendants and Packer Defendants as genuine honey;

      d.    Whether Defendants, by their conduct, conspired to violate or actually violated RICO;

      e.    Whether Defendants, by their conduct, violated the Sherman Act;

      f.    Whether Defendants, by their conduct, violated the Cartwright Act;

      g.    Whether Defendants, by their conduct, violated the UCL;

      h.    Whether Defendants' conduct caused injury to the business or property of Plaintiff sand other Class Members;

      i.    The appropriate measure of damages sustained by Plaintiffs and other Class Members, or the amount of restitution due to them; and

      j.    The appropriate injunctive relief.

## II.   RULE 23(B)(2) REQUIREMENTS

122.   Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

123.   Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendants. Money alone will not afford adequate and complete relief, and

injunctive relief is necessary to restrain Defendants from continuing to import, certify as genuine, and sell fake honey in the United States' honey market.

## III.   RULE 23(B)(3) REQUIREMENTS

124. **Predominance**: As set forth herein, common issues of fact and law predominate because Plaintiffs' claims are based on a common course of conduct by Defendants. Whether Defendants' conduct violates RICO, the Sherman Act, the Cartwright Act, and the UCL are questions common to all Class Members and the predominating issues in this litigation, and Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

125. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.   Given the size of the claims of individual Class Members, as well as the resources of Defendants, few Class Members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b.   This action will permit an orderly and expeditious administration of the Class Members' claims, will foster economies of time, effort, and expense, and will ensure uniformity of decisions;

c.   Any interest of Class Members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system;

d.   Without a class action, Class Members will continue to suffer damages, Defendants' violations of law will proceed without remedy, and Defendants will continue to reap and retain the substantial proceeds derived from their wrongful and unlawful conduct;

e.   This action presents no difficulties that will impede its management by the Court as a class action; and

f.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

**First Cause of Action**

**Violations of the Racketeer Influenced and Corrupt Organizations Act,**

**18 U.S.C. §§ 1962(c)**

126.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, as though fully set forth herein.

127.   Plaintiffs and the Class bring this claim against Defendants for relief pursuant to 18 U.S.C. §§ 1962(c) & 1964(c) of RICO.

128.   Plaintiffs and other Class Members are "persons" as that term is defined in 18 U.S.C. § 1961(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

129.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), because they are entities capable of holding legal or beneficial interest in property.

130.   Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

131.   Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

132.  RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise

32

CLASS ACTION COMPLAINT

generally has three structural features, including: (a) a purpose; (b) relationships among those associated with the enterprise; and (c) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

133.   As alleged below and throughout this Complaint, Defendants orchestrated a scheme to deprive Plaintiffs and the Class of money or property by flooding the United States' honey market with fake honey, which they pass off as genuine. Defendants conducted their business through an association-in-fact enterprise in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of enabling Defendants to enjoy massive profits and prevent domestic commercial beekeepers, like Plaintiffs and other Class Members, from being able to survive, let alone compete.

134.   Defendants' endeavor had the desired effect. Defendants secured unlawful profits during the pendency of the enterprise. And, as collateral damage, Plaintiffs and other Class Members suffered injury to their business and property in the form of, *inter alia*, lost sales and lost profits.

### A.   The True Source-Importer Enterprise

135.   The Importer Defendants and True Source formed an association-in-fact enterprise, referred to as the "True Source-Importer Enterprise."

136.   The True Source-Importer Enterprise included: (a) the Importer Defendants, their subsidiaries, employees, and agents; and (b) True Source, its subsidiaries, employees, and agents.

137.   The True Source-Importer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Member; (c) eliminating Plaintiffs and other Class Members as competitors by selling fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) generally undermining the

credibility and economics of the domestic honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

138.   Each member of the True Source-Importer Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

139.   Each member of the True Source-Importer Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But the enterprise and each member thereof (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

140.   The patterns of racketeering activity alleged herein are separate and distinct from each other. Likewise, the Importer Defendants and True Source are distinct from the True Source-Importer Enterprise, and they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, individual personhood, reporting requirements, and financial statements.

141.   The members of the True Source-Importer Enterprise are systematically linked through continually-coordinated activities, financial ties, and contractual business arrangements, and the True Source-Importer Enterprise is ongoing and continuing.

142.   Neither the Importer Defendants nor True Source could have accomplished the purpose of the True Source-Importer Enterprise without the assistance of the other and profited financially from the scheme.

143.   The members of the True Source-Importer Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

144. The True Source-Importer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling fake honey for purchase by businesses and consumers in the United States.

145. As a result of the True Source-Importer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey at a loss, to the extent they can even sell it all, and in some instances have been unable to sell their honey to large retailers, who are unwilling to pay a fair price for their honey because they can get True Source Certified fake honey for far less.

### 1.      Conduct of the Enterprise

146. The Importer Defendants and True Source exerted control over the True Source-Importer Enterprise and participated in the operation and management of its affairs, directly and indirectly.

147. The Importer Defendants participated in the operation and management of the enterprise by distributing and selling fake honey for purchase by businesses and consumers in the United States.

148. True Source participated in the operation and management of the enterprise by allowing the Importer Defendants to use the True Source Certified Seal to falsely represent their fake honey as genuine honey.

### 2.      Pattern of Racketeering Activity of the Enterprise

149. The Importer Defendants and True Source carried out their scheme through a pattern of racketeering activity that caused the use of private or commercial interstate carriers and/or the wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute fake honey to businesses and persons throughout the United States.

150. Defendants' predicate acts of racketeering activity, *see* 18 U.S.C. § 1961(1)(B), include, but are not limited to:

a.      **Mail Fraud**: The Importer Defendants and True Source violated 18 U.S.C. § 1341 by sending/or receiving, or causing to be sent and/or received

materials via commercial interstate carriers, for the purpose of executing their unlawful and fraudulent scheme to profit from the sale of fake honey.

b. **Wire Fraud**: The Importer Defendants and True Source violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received materials by wire for the purpose of executing their unlawful and fraudulent scheme to profit from the sale of fake honey.

151. The True Source-Importer Enterprise's pattern of racketeering likely involved thousands of separate instances in which commercial interstate carriers or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering, including mail and wire fraud, as Defendants' business is conducted through the creation of numerous records that are necessary to perpetrate the fraud.

152. Many of the precise dates of Defendants' fraudulent use of interstate carriers or interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

153. Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud that occurred. They include the Importer Defendants' fraudulent purchase orders, bills of lading, invoices, packing lists, certificates of analysis, and other papers that have been used to falsely and fraudulently declare their fake honey products to be genuine honey, and use of the True Source Certified Seal to falsely represent the Importer Defendants' fake honey to be genuine honey.

154. The Importer Defendants and True Source knew and intended that businesses and other persons would rely on the material misrepresentations made by them, and would be misled into purchasing the Importer Defendants' fake honey believing it to be genuine honey.

155. The Importer Defendants and True Source knew, and intended that, their introduction of fake honey into the United States' honey market would: (a) suppress the price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members;

(c) eliminate Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; (d) undermine the credibility and economics of the domestic honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

156.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Importer Defendants and True Source intended to and did defraud purchasers of the Importer Defendants' fake honey, to the financial detriment of Plaintiffs and other Class Members.

### 3.   Damages

157.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs and other Class Members injury in their business and property because Plaintiffs and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' conduct.

158.   Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey, misrepresented as genuine, to businesses and other persons throughout the United States.

159.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs also seeks attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

### B.   The Certifier-Packer Enterprise

160.   The Packer Defendants and the Certifier Defendants (True Source, Intertek, and NSF) formed an association-in-fact enterprise, referred to as the "Certifier-Packer Enterprise."

161.   The Certifier-Packer Enterprise included: (a) the Packer Defendants, their subsidiaries, employees, and agents; and (b) the Certifier Defendants, their subsidiaries, employees, and agents.

162.   The Certifier-Packer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminating Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) generally undermining the credibility and economics of the domestic genuine honey market to their financial benefit and the financial detriment of Plaintiffs and other Class Members.

163.   Each member of the Certifier-Packer Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

164.   Each member of the Certifier-Packer Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

165.   The patterns of racketeering activity alleged herein are separate and distinct from each other. Likewise, the Packer Defendants and the Certifier Defendants are distinct from the Certifier-Packer Enterprise, and they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, individual personhood, reporting requirements, and financial statements.

166.    The members of the Certifier-Packer Enterprise are systematically linked through continually-coordinated activities, financial ties, and contractual business arrangements, and the Certifier-Packer Enterprise is ongoing and continuing.

167.    Neither the Packer Defendants nor the Certifier Defendants could have accomplished the purpose of the Certifier-Packer Enterprise without the assistance of the other and profited financially from the scheme.

168.    The members of the Certifier-Packer Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

169.    The Certifier-Packer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling mislabeled fake honey for purchase by businesses and consumers in the United States.

170.    As a result of the Certifier-Packer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey products at a loss, to the extent they can even sell it all, and in some instances have been unable to sell their honey to large retailers, who are unwilling to pay a fair price for their honey because they can get True Source Certified fake honey for far less.

### 1.    Conduct of the Enterprise

171.    The Packer Defendants and the Certifier Defendants exerted control over the Certifier-Packer Enterprise and participated in the operation and management of its affairs, directly and indirectly.

172.    The Packer Defendants participated in the operation and management of the enterprise by distributing and selling fake honey, represented to be genuine, for purchase by retailers and other businesses in the United States.

173.    The Certifier Defendants participated in the operation and management of the enterprise by knowingly certifying the Packer Defendants' fake honey as genuine honey.

### 2.    Pattern of Racketeering Activity of the Enterprise

174.   The Packer Defendants and the Certifier Defendants carried out their scheme through a pattern of racketeering activity that caused the use of private or commercial interstate carriers and/or the wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute fake honey to businesses and persons throughout the United States.

175.   Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) include, but are not limited to:

a.   **Mail Fraud**: The Packer Defendants and the Certifier Defendants violated 18 U.S.C. § 1341 by sending/or receiving, or causing to be sent and/or received materials via commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

b.   **Wire Fraud**: The Packer Defendants and the Certifier Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

176.   The Certifier-Packer Enterprise's pattern of racketeering likely involved thousands of separate instances in which commercial interstate carriers or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering, including mail and wire fraud, as Defendants' business is conducted through the creation of numerous records that are necessary to perpetrate the fraud.

177.   Many of the precise dates of Defendants' fraudulent use of interstate carriers or interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

178.   Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud that occurred. They include the Packer Defendants' fraudulent purchase orders, bills of lading, invoices, packing lists, certificates of analysis, and other papers that have been used to falsely and fraudulently declare their fake honey to be genuine, and the Certifier Defendants' systematic certification of the Packers' fake honey as genuine honey.

179.  The Packer Defendants and the Certifier Defendants knew, and intended that, businesses and other persons would rely on the material misrepresentations made by them and would be misled into purchasing the Packer Defendants' fake honey products, falsely believing them to be genuine honey.

180.  The Packer Defendants and the Certifier Defendants knew, and intended that, their introduction of fake honey into the United States' honey market would (a) suppress the price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminate Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) undermine the credibility and economics of the domestic genuine honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

181.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Importer Defendants and the Certifier Defendants intended to and did defraud purchasers of the Packer Defendant's fake honey, to the financial detriment of Plaintiffs and other Class Members.

### 3.  Damages

182.  Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs' and other Class Members' injury in their business and property because Plaintiffs and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' conduct.

183.  Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey to businesses and other persons throughout the United States.

184.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs also seek attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## C.   The Importer-Packer Enterprise

185.   The Importer Defendants and Packer Defendants formed an association-in-fact enterprise, referred to as the "Importer-Packer Enterprise."

186.   The Importer-Packer Enterprise included: (a) the Packer Defendants, their subsidiaries, employees, and agents; and (b) the Importer Defendants, their subsidiaries, employees, and agents.

187.   The Importer-Packer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and the Class; (c) eliminating Plaintiffs and the Class as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) generally undermining the credibility and economics of the domestic honey market to their financial benefit and the financial detriment of Plaintiffs and other Class Members.

188.   Each member of the Importer-Packer Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

189.   Each member of the Importer-Packer Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

190.   The patterns of racketeering activity alleged herein are separate and distinct from each other. Likewise, the Importer Defendants and the Packer Defendants are distinct from the Importer-Packer Enterprise, and they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, individual personhood, reporting requirements, and financial statements.

191.   The members of the Importer-Packer Enterprise are systematically linked through continually-coordinated activities, financial ties, and contractual business arrangements, and the Importer-Packer Enterprise is ongoing and continuing.

192.   Neither the Importer Defendants nor the Packer Defendants could have accomplished the purpose of the Importer-Packer Enterprise without the assistance of the other and profited financially from the scheme.

193.   The members of the Importer-Packer Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

194.   The Importer-Packer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling mislabeled fake honey for purchase by businesses and consumers in the United States.

195.   As a result of the Importer-Packer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey at a loss, to the extent they can even sell it at all, and in some instances have been unable to sell their honey to large retailers, who are unwilling to pay a fair price for their honey because they can get True Source Certified fake honey for far less.

### 1.   Conduct of the Enterprise

196.   The Importer Defendants and the Packer Defendants exerted control over the Importer-Packer Enterprise and participated in the operation and management of its affairs, directly and indirectly.

197.   The Importer Defendants participated in the operation and management of the enterprise by importing and selling fake honey for purchase by businesses and consumers in the United States.

198.   The Packer Defendants participated in the operation and management of the enterprise by purchasing, distributing, and selling fake honey, misrepresented as genuine, for purchase by retailers and other businesses in the United States.

### 2.   Pattern of Racketeering Activity of the Enterprise

199.   The Importer Defendants and the Packer Defendants carried out their scheme through a pattern of racketeering activity that caused the use of private or commercial interstate carriers and/or the wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute fake honey to businesses and persons throughout the United States.

200.   Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) include, but are not limited to:

a.   **Mail Fraud**: The Importer Defendants and the Packer Defendants violated 18 U.S.C. § 1341 by sending/or receiving, or causing to be sent and/or received materials via commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

b.   **Wire Fraud**: The Importer Defendants and the Packer Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

201.   The Importer-Packer Enterprise's pattern of racketeering likely involved thousands of separate instances in which commercial interstate carriers or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering, including mail and wire fraud, as Defendants' business is conducted through the creation of numerous records that are necessary to perpetrate the fraud.

CLASS ACTION COMPLAINT

202.   Many of the precise dates of Defendants' fraudulent use of interstate carriers or interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

203.   Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud that occurred. They include the Defendants' fraudulent purchase orders, bills of lading, invoices, packing lists, certificates of analysis, and other papers that have been used to falsely and fraudulently declare their fake honey to be genuine.

204.   The Importer Defendants and the Packer Defendants knew and intended that businesses and other persons would rely on the material misrepresentations made by them and would be misled into purchasing Defendants' mislabeled and adulterated fake honey.

205.   The Importer Defendants and the Packer Defendants knew and intended that, their introduction of fake honey into the United States' honey market would (a) suppress the price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminate Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) undermine the credibility and economics of the domestic genuine honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

206.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Importer Defendants and the Packer Defendants intended to and did defraud purchasers of the Defendants' fake honey, to the financial detriment of Plaintiffs and other Class Members.

### 3.   Damages

207.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs' and other Class Members' injury in their business and property because Plaintiffs

and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' conduct.

208.   Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey to businesses and other persons throughout the United States.

209.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs also seek attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

**Second Cause of Action**

**Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)**

210.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, as though fully set forth herein.

211.   Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

212.   Defendants knew they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

213.   Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the enterprises described above through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

214.   Each of the Defendants knew about and agreed to facilitate the scheme to injure Plaintiffs and other Class Members in their business and property through the wrongful and unlawful acts identified herein. It was part of the conspiracy that Defendants

would commit a pattern of racketeering activity in the conduct of the affairs of the enterprises described above, including the acts of racketeering set forth herein.

215.   As a direct and proximate result of Defendants' conspiracy, the acts of racketeering activity of the enterprises described above, the overt acts taken in furtherance of that conspiracy, and Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and other Class Members have been injured in their business and property, as set forth above.

216.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs also seek attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

**Third Cause of Action**

**Violation of the Sherman Antitrust Act,**

**15 U.S.C. § 1**

217.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

218.   Defendants have substantial market power in the United States honey market. During the Class Period and continuing today, Defendants exercised this power to flood the honey market with mislabeled and adulterated fake honey, and to depress prices for genuine honey. Defendants' combined efforts have made it impossible for domestic producers of genuine honey to compete. In order to bring honey from farm to market, beekeepers rely on a limited number of packers to undertake the labor and expense of processing, packaging, and marketing their genuine honey. Moreover, there is not enough domestic genuine honey supply to meet demand in the United States honey market, such that reliance on imported honey is necessary. Defendants use these circumstances to manipulate the market by certifying and importing fake honey, depriving Plaintiffs and other Class Members of free and open competition, and depressing the price of genuine, bee-made honey.

219.   Defendants' anticompetitive conduct has flooded the United States honey market with fake honey, thereby creating a false increase in supply, and has suppressed the

47

**CLASS ACTION COMPLAINT**

market price for genuine, bee-made honey. Plaintiffs and other Class Members have thus been deprived of free and open competition.

220.   By reason of these violations of the antitrust laws, Plaintiffs and other Class Members have sustained injury to their businesses or property, having been paid lower prices for their genuine honey than they would have otherwise been paid, and sold less genuine honey than they would otherwise have sold in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

221.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

222.   Beginning at least as early as July 2010, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially depress prices for genuine honey in the United States, in violation of Section I of the Sherman Antitrust Act, 15 U.S.C. § 1.

223.   In formulating and carrying out the agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do in order to depress the price of genuine honey. The combination and conspiracy has had the following effects, among others:

    a.      Price competition in the purchase of genuine honey has been restrained, suppressed, and/or eliminated in the United States;

    b.      Prices for genuine honey sold to Defendants and all of their co-conspirators have been depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States; and

    c.      Those who sold their genuine honey directly to Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

224.   Plaintiffs and other Class Members have been injured and will continue to be injured in their businesses and property by being paid less for genuine honey that they sell than they would otherwise have been paid and will be paid, and by selling less genuine

CLASS ACTION COMPLAINT

honey than they would otherwise have sold, in the absence of combination and conspiracy by Defendants and their co-conspirators.

225.   Plaintiffs and members other Class Members seek and are entitled to damages and an injunction against Defendants preventing and restraining the violations alleged herein.

**Fourth Cause of Action**

**Violations of the California Cartwright Act,**

**Cal. Bus. & Prof. Code § 16720**

226.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, as though fully set forth herein.

227.   As described herein, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust, combining their capital, skills, and acts for the purpose of creating and carrying out restrictions of trade and commerce.

228.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other Class Members were injured in their business and property in that they were unable to sell their genuine honey at fair market prices.

229.   As a result of Defendants' violation of section 16720, Plaintiffs bring this claim pursuant to Cal. Bus. & Prof. Code § 16750(c) seeking all relief as allowed by law, including *inter alia*, actual damages and treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest.

**Fifth Cause of Action**

**Violations of the Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**

230.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, as though fully set forth herein.

231.   Plaintiffs bring this claim for relief under the "unfair," "fraudulent," and "unlawful" prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

Code §§ 17200 *et seq.*, on behalf of themselves and other Class Members, all of whom were subject to Defendants' above-described unlawful conduct.

232.   Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' conduct described herein. Specifically, Defendants distributed and sold their fake honey at substantially lower market prices than the genuine honey produced and sold by Plaintiffs, placing Plaintiffs in positions where they could not compete. As a result of Defendants' conduct, Plaintiffs have lost honey sales and profits they would have otherwise made absent Defendants' conduct.

### A.   Defendants' "Unfair" Conduct

233.   Defendants' business practices, as alleged herein, are unfair because: (a) the injury to the consumer is substantial; (b) the injury is not outweighed by any countervailing benefits to consumers or competition; and (c) consumers could not reasonably have avoided the injury because Defendants misled the consuming public through their own misrepresentations and omissions.

234.   Defendants' business practices are also unfair because their conduct described herein is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and the gravity of the harm to consumers is not outweighed by the utility of Defendants' conduct.

235.   Lastly, Defendants' business practices are unfair because they undermine public policy, which is tethered to specific constitutional and statutory provisions, including RICO and the Sherman Antitrust Act.

### B.   Defendants' "Fraudulent" Conduct

236.   As described herein, Defendants falsely represented, and continue to falsely represent that the fake honey sold by the Importer Defendants and the Packer Defendants was and is genuine honey.

237.   Defendants' conduct was and is likely to deceive members of the public. Defendants were and are aware their conduct would induce businesses and other persons to purchase the fake honey sold by the Importer Defendants and the Packer Defendants.

238.   The businesses and other persons who purchased the fake honey sold by the Importer Defendants and the Packer Defendants would not have done so had they known such products were not genuine honey.

239.   Defendants' misrepresentations and omissions are thus material and constitute fraudulent business practices within the meaning of the UCL.

### C.    Defendants' "Unlawful" Conduct

240.   Defendants' conduct was "unlawful" within the meaning of the UCL because, as alleged herein, it violated RICO and the Sherman Antitrust Act. In addition, Defendants' conduct in labeling fake honey with True Source Certified seal indicating the product is genuine violates the Federal Food, Drug, and Cosmetic Act, which renders misbranded any food whose "labeling is in any particular," 21 U.S.C. § 343(a).

### D.    The Class was Injured by Defendants' UCL Violations

241.   Plaintiffs and other Class Members suffered injury in fact and lost money or property as a result of Defendants' actions as set forth herein. By engaging in the unfair, fraudulent, and unlawful conduct described above, Defendants have: (a) suppressed the price of genuine honey in the domestic honey market; (b) diverted sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminated Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) undermined the credibility and economics of the domestic genuine honey market to their financial benefit and Plaintiffs' and other Class Members' financial detriment.

242.   Defendants' wrongful business practices constitute a continuing course of conduct of unfair competition since Defendants continue to distribute and sell fake honey as genuine to businesses and other persons throughout the United States.

243.   Plaintiffs' legal remedies are inadequate because, pursuant to section 17203 of the UCL, Plaintiffs seek restitution, which may be measured differently than damages, and an order of this Court enjoining Defendants from engaging in the unfair and fraudulent

business practices alleged herein in connection with the distribution and sale of fake honey to businesses and other persons throughout the United States.

<b>Sixth Cause of Action</b>

<b>Unjust Enrichment</b>

244.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, as though fully set forth herein.

245.   By their wrongful acts described herein, Defendants were unjustly enriched at the expense of Plaintiffs and other Class Members.

246.   It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct.

247.   Plaintiffs, on behalf of themselves and other Class Members, seek restitution from Defendants, and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   An Order certifying the proposed Class, appointing Plaintiffs and their Counsel to represent the Class, and directing Defendants to pay the cost of Class Notice;

B.   An Order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

C.   An Order declaring Defendants conspired to violate and in fact violated the Racketeering Influenced Corrupt Practices Act, the Sherman Antitrust Act, the California Cartwright Act, and the California Unfair Competition Law, and were unjustly enriched;

D.   Compensatory damages and/or restitution for economic loss and out-of-pocket costs, treble damages, and punitive and exemplary damages allowed under applicable law;

52

1      E.     Pre- and post-judgment interest on any amounts awarded;

2      F.     An award of attorneys' fees and costs; and

3      G.     Such other or further relief as the Court may deem appropriate, just and equitable.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues in this action so triable.

Dated:  March 29, 2021      By: _____

                  Gillian L. Wade

**MILSTEIN JACKSON**
**FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
*gwade@mjfwlaw.com*
Sara D. Avila, State Bar No. 263213
*savila@mjfwlaw.com*
Marc A. Castaneda, State Bar No. 299001
*mcastaneda@mjfwlaw.com*
10990 Wilshire Boulevard, Suite 800,
Los Angeles, CA 90024
Phone: (310) 396-9600


**REESE LLP**
Michael R. Reese, State Bar No. 206773
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Phone: (212) 643-0500

Carlos F. Ramirez (*pro hac vice* to be filed)
*cramirez@reesellp.com*
7 Skyline Drive
Hawthorne, New York 10532
Phone: (914) 860-4994

CLASS ACTION COMPLAINT

**THE LAW OFFICE OF JACK FITZGERALD, PC**
Jack Fitzgerald, State Bar No. 257370
*jack@jackfitzgeraldlaw.com*
Trevor M. Flynn, State Bar No. 253362
*trevor@jackfitzgeraldlaw.com*
Melanie Persinger, State Bar No. 275423
*melanie@jackfitzgeraldlaw.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 692-3840

***Counsel for Plaintiffs***

CLASS ACTION COMPLAINT