1  **MILSTEIN JACKSON**
   **FAIRCHILD & WADE, LLP**
2  Gillian L. Wade, State Bar No. 229124
3  *gwade@mjfwlaw.com*
   10990 Wilshire Boulevard, 8th Floor
4  Los Angeles, California 90024
   Phone: (310) 396-9600
5  **REESE LLP**
6  Michael R. Reese, State Bar No. 206773
   *mreese@reesellp.com*
7  100 West 93rd Street, 16th Floor
   New York, New York 10025
8  Phone: (212) 643-0500
9  **FITZGERALD JOSEPH LLP**
   Jack Fitzgerald, State Bar No. 257370
10 *jack@fitzgeraldjoseph.com*
11 2341 Jefferson Street, Suite 200
   San Diego, California 92110
12 Phone: (619) 215-1741
13 *Counsel for Plaintiffs*
   *(additional attorneys listed below)*
14
   **UNITED STATES DISTRICT COURT**
15 **EASTERN DISTRICT OF CALIFORNIA**

16 HENRY'S BULLFROG BEES, a California | Case No.: 2:21-CV-00582-TLN-CKD
17 apiary; GOLDEN PRAIRIE HONEY |
   FARMS CORPORATION, d/b/a VALOR | **SECOND AMENDED CLASS ACTION**
18 HONEY, a Kansas not for profit corporation; | **COMPLAINT FOR UNJUST**
   and KELVIN ADEE, an individual, on | **ENRICHMENT AND VIOLATIONS OF:**
19 behalf of themselves, all others similarly |
   situated, and the general public, |
20 | **1. THE RACKETEER INFLUENCED**
      Plaintiffs, | **AND CORRUPT PRACTICES ACT;**
21 |
            v. | **2. THE SHERMAN ANTITRUST ACT;**
22 SUNLAND TRADING, INC.; LAMEX |
   FOODS, INC.; ODEM INTERNATIONAL | **3. THE CALIFORNIA CARTWRIGHT**
23 INC.; BARKMAN HONEY, LLC; DUTCH | **ACT; AND**
   GOLD HONEY, INC.; TRUE SOURCE |
24 HONEY, LLC; INTERTEK FOOD | **4. THE CALIFORNIA UNFAIR**
25 SERVICES GMBH; and NSF | **COMPETITION LAW.**
   INTERNATIONAL, |
26 | JURY TRIAL DEMANDED
27      Defendants. |
28

SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

THE PARTIES ........................................................................................................... 2

JURISDICTION AND VENUE ................................................................................ 5

FACTUAL ALLEGATIONS ..................................................................................... 6

    I.     THE PRODUCTION AND STANDARD OF IDENTITY OF
          GENUINE HONEY ....................................................................... 6

    II.    THE UNITED STATES' HONEY MARKET SUFFERS FROM
          ECONOMICALLY-MOTIVATED ADULTERATION ................. 10

    III.   THE DETECTION OF FAKE HONEY ........................................ 15

    IV.  DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES'
          HONEY MARKET ....................................................................... 17

         A.    Industry Members Create True Source in 2010, Purportedly to
              Address Honey Adulteration ................................................ 17

         B.    The Certifier Defendants' Scheme to Defraud ..................... 26

         C.    The Importer Defendants' Scheme to Defraud ..................... 31

         D.    The Packer Defendants' Scheme to Defraud ........................ 40

    V.   DEFENDANTS' SCHEME HARMED THE MARKET AND
          INJURED PLAINTIFFS AND OTHER DOMESTIC
          COMMERCIAL BEEKEPERS ................................................... 42

CLASS ALLEGATIONS ......................................................................................... 44

    I.     RULE 23(A) REQUIREMENTS ............................................... 45

    II.    RULE 23(B)(2) REQUIREMENTS ............................................ 46

i

III.    RULE 23(B)(3) REQUIREMENTS .................................................................46

CAUSES OF ACTION .................................................................................................47

I.    FIRST CAUSE OF ACTION - VIOLATIONS OF THE
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT, 18 U.S.C. §§ 1962(C) .................................................................47

A.    The Certifier-Importer Enterprise .........................................................49

1.    Conduct of the Enterprise .........................................................50

2.    Pattern of Racketeering Activity of the Enterprise.....................51

3.    Damages .........................................................................53

B.    The Certifier-Packer Enterprise .................................................53

1.    Conduct of the Enterprise .........................................................55

2.    Pattern of Racketeering Activity of the Enterprise.....................55

3.    Damages .........................................................................57

C.    The Importer-Packer Enterprise.................................................57

1.    Conduct of the Enterprise .........................................................59

2.    Pattern of Racketeering Activity of the Enterprise.....................59

3.    Damages .........................................................................61

II.    SECOND CAUSE OF ACTION - CONSPIRACY TO VIOLATE
THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. § 1962(D) ...............................61

III.    THIRD CAUSE OF ACTION - VIOLATION OF THE SHERMAN
ANTITRUST ACT, 15 U.S.C. § 1 .................................................62

ii

IV.   FOURTH CAUSE OF ACTION - VIOLATIONS OF THE
      CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §
      16720 ........................................................................................66

V.    FIFTH CAUSE OF ACTION, VIOLATIONS OF THE UNFAIR
      COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200 *ET
      SEQ*..........................................................................................66

      A.   Defendants' "Unfair" Conduct.................................................67

      B.   Defendants' "Unlawful" Conduct............................................67

      C.   The Class was Injured by Defendants' UCL Violations..........67

VI.   SIXTH CAUSE OF ACTION - UNJUST ENRICHMENT ...........................68

PRAYER FOR RELIEF...........................................................................68

DEMAND FOR JURY TRIAL..................................................................69

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Henry's Bullfrog Bees ("Bullfrog Bees"), Golden Prairie Honey Farms Corp d/b/a Valor Honey ("Valor Honey"), and Kelvin Adee as co-owner of Adee Honey Farms ("Adee") (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Class Action Complaint, individually and on behalf of others similarly situated and the general public, against the following defendants:

(A) the Importer Defendants: Sunland Trading, Inc. ("Sunland"); Lamex Foods, Inc. ("Lamex"); and Odem International Inc. ("Odem");

(B) the Packer Defendants: Barkman Honey LLC ("Barkman") and Dutch Gold Honey, Inc. ("Dutch Gold"); and

(C) the Certifier Defendants: True Source Honey LLC ("True Source"), Intertek Food Services GmbH ("Intertek"), and NSF International ("NSF").

Based on their own personal knowledge, or upon information and belief, including the investigation of their counsel, Plaintiffs allege as follows:

## INTRODUCTION

1.     The Importer and Packer Defendants are some of the largest honey importers and packers in the United States, while Certifier Defendant True Source holds itself out as a honey industry watchdog. For years, Defendants have participated in a worldwide conspiracy to defraud the United States honey market by knowingly and intentionally flooding it with fake honey that is adulterated, impure, or mislabeled, which True Source knowingly and intentionally falsely certifies as genuine. Indeed, an accredited food testing laboratory has revealed widespread use of extraneous, non-honey syrups in products labeled as True Source certified "honey" sold by Defendants in the United States during the Class Period,[1] specifically Defendants Barkman and Odem.

2.     Plaintiffs are commercial beekeeping farms in the business of selling genuine honey. Defendants' wrongful conduct has suppressed prices in the domestic honey market, making it difficult or impossible for domestic commercial beekeeping farms like Plaintiffs to

---

[1] "Class Period" means since March 29, 2017.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

compete. As a direct consequence of Defendants' wrongful conduct, Plaintiffs and other Class Members have effectively been blocked from selling their honey in the marketplace, suffering lost sales and profits as a result.

3.     Plaintiffs bring this action on their own behalf, on behalf of a Class of domestic commercial beekeepers, and on behalf of the general public, to recover compensation for injuries to their businesses and property caused by Defendants' knowing involvement and participation in the scheme in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), the Sherman Antitrust Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal Bus. & Prof. Code § 16720, and Unfair Competition Law, *id.* §§ 17200, *et seq.* (the "UCL"), and to enjoin Defendants' wrongful conduct.

## THE PARTIES

### The Plaintiffs

4.     Plaintiff Henry's Bullfrog Bees, a sole proprietorship, is an apiary located in Winters, California, which is engaged in the business of selling honey. Henry's Bullfrog Bees has approximately 7,600 hives.

5.     Plaintiff Golden Prairie Honey Farms Corp d/b/a Valor Honey ("Valor Honey") (previously, SAVE Golden Prairie Honey Farms, LLC) is a not-for-profit honey production and beekeeping supply business located in Manhattan, Kansas. Valor Honey was once part of the Servicemember Agricultural Vocation Education (SAVE) Farm program, and is a 501(c)(3) non-profit, charitable, and educational corporation whose mission is to train veterans and transitioning service members as a way of helping many overcome psychological challenges reintegrating into civilian society after war. Valor Honey has approximately 500 beehives and maintains its own apiaries where it teaches hands-on beekeeping and harvesting of honey. Valor Honey packs the honey it produces, along with honey it purchases from other local beekeepers, for retail sale. All proceeds from the sale of Valor Honey's honey goes back into its training programs. Each winter, Valor Honey sends its beehives to California for the annual almond pollination season.

2

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

6.       Plaintiff Kelvin Adee is a citizen of South Dakota and co-owner of Adee Honey Farms ("Adee"), the country's largest domestic commercial beekeeping farm, with over 80,000 hives. Adee Honey Farms has operations throughout the United States, including in Woodville, Mississippi and Arvin, California. Established as a honey production farm in the early 1940's, Adee Honey Farms began sending bees to California in 1990 for the annual almond pollination season, shipping truckloads of honeybees across the nation every year. The farm still follows this migratory pattern, keeping the bees in the Midwest during the summer for honey production, and sending them to California in the fall to spend the winter, until the almonds bloom for pollination.

**The Importer Defendants**

7.       Defendant Sunland is a wholesale honey import company with its principal place of business in New Canaan, Connecticut. Sunland purchases purported honey from foreign exporters and distributes it to packers and other entities throughout the United States, including in California. The honey purchased by Sunland from India, Vietnam, and Thailand contains extraneous syrups and/or is processed with resin technology which changes the honey's fundamental composition. Sunland is aware its honey is fake. President Nicholas Sargeantson admitted in January 2010 that there is no white or extra light amber honey that originates from India, Vietnam, or Thailand, yet Sunland continues to import such "honey" from those countries and has done so during the Class Period.

8.       Defendant Lamex is a wholesale honey import company with its principal place of business in Minneapolis, Minnesota. Lamex purchases purported honey from foreign exporters and distributes it to packers and other entities throughout the United States, including in California. The honey purchased by Lamex from India, Vietnam, and Thailand contains extraneous syrups and/or is processed with resin technology which changes the honey's fundamental composition. Lamex continues to import such "honey" from those countries and has done so during the Class Period.

9.       Defendant Odem is a wholesale honey import company with its principal place of business in Rosemere, Quebec, Canada. Odem purchases purported honey from foreign

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

exporters and distributes it to packers and other entities throughout the United States, including in California. The honey purchased by Lamex from India, Vietnam, and Thailand contains extraneous syrups and/or is processed with resin technology which changes the honey's fundamental composition. Defendant Barkman tested the honey it purchased from Odem in June 2018 using an accredited food testing laboratory and determined that 24 samples originating from India all tested positive for adulteration with added sugar syrup. Despite awareness that its honey is fake, Odem sold its honey to Barkman, which ultimately brought it into the United States honey market during the Class Period.

**The Packer Defendants**

10.    Defendant Barkman is a honey packing company with its principal place of business in either Wichita or Hillsboro, Kansas. Barkman sells its honey to retailers throughout the United States, including in California. Despite learning the honey it has purchased from Odem is adulterated with added sugar syrup, Barkman has continued to sell that adulterated honey (which it purchases from Odem) to purchasers in the United States during the Class Period.

11.    Defendant Dutch Gold is a honey packing company with its principal place of business in Lancaster, Pennsylvania. Dutch Gold sells its honey to retailers throughout the United States, including in California. In 2020, Dutch Gold "honey" from Vietnam and India was tested by an accredited laboratory and found to contain extraneous non-honey syrups, meaning it is adulterated, fake honey.

**The Certifier Defendants**

12.    Defendant True Source is a trade organization with its principal place of business in Washington, D.C. True Source's Board of Directors is comprised of the following individuals:

        a.    Eric Wenger, Barkman Honey, LLC – Chair

        b.    Prakash Kejriwal, Kejriwal Group, India – Vice Chair

        c.    Jill Clark, Dutch Gold Honey, Inc. – Treasurer

        d.    Michelle Poulk, Burleson's, Inc. – Secretary

4

1         e.     Tim Hiatt, Hiatt Honey Company

2         f.     Nicholas Sargeantson, Sunland International – Executive Member

3         g.     Chris Olney, HoneyTree, Inc.

4         h.     Greg Mohr, Bee Maid Honey, Canada

5         i.     Normand Bernier, Odem International, Canada

6         j.     Javier Nascel, NEXCO S. A., Argentina

7         k.     Nguyen Thi Hang, HANOIBEE JSC., Vietnam

8         l.     Gordon Marks – Executive Director

9     13.    Defendant Intertek Food Services GmbH is a food testing laboratory with its

10 principal place of business in Bremen, Germany. Intertek tests honey that, after making its

11 way through the stream of commerce, is ultimately sold to packers, retailers, and consumers

12 in California. Intertek is owned by Intertek Group PLC. Rather than engaging in legitimate

13 testing for honey authenticity, Intertek provides the results requested by its clients, including

14 the Packer Defendants, with little to no analysis. Rather than providing its customers with

15 underlying data of the test results, Intertek simply reports that the honey is not adulterated.

16     14.    Defendant NSF International is an auditing organization with its principal place

17 of business in Ann Arbor, Michigan. NSF audits honey that, after making its way through the

18 stream of commerce, is ultimately sold to packers, retailers, and consumers in California.

19 NSF accepts bribes from True Source Certified exporters and packers to conduct sham,

20 cursory audits.

21                          **JURISDICTION AND VENUE**

22     15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

23 §§ 1331 and 1367(a), because Plaintiffs' claims under 15 U.S.C. § 1 (the Sherman Act), and

24 18 U.S.C. § 1964 (RICO) raise federal questions; and the Court has supplemental jurisdiction

25 over Plaintiffs' claims under California state law.

26     16.    This Court has personal jurisdiction over Defendants because Defendants have

27 substantial contacts with this District.

28     17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

Defendants are subject to the Court's personal jurisdiction herein. Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District.

## FACTUAL ALLEGATIONS

### I. THE PRODUCTION AND STANDARD OF IDENTITY OF GENUINE HONEY

18.    Genuine honey is the natural sweet substance produced by species within the *Apis* genus from the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking insects on the living parts of plants which bees collect, transform by combining with specific substances of their own, deposit, dehydrate, store, and leave in the honeycomb to ripen.

19.    Genuine honey consists primarily of simple sugars, predominantly fructose and glucose, as well as other substances such as organic acids, enzymes, and solid particles derived from nectar collection by bees, including pollen. The color of genuine honey varies from nearly colorless to dark brown. The consistency can be fluid, viscous, or partially- to entirely-crystallized. These parameters are dependent upon the botanical origin of the honey, processing, specific composition, storage temperature, and related factors. Genuine honey eventually crystallizes naturally. The flavor and aroma of genuine honey are variable, mainly depending on its botanical origin.

20.    Nectar or honeydew collected by bees must undergo a series of complicated processes for it to be transformed into genuine honey. This transformation occurs in the beehive, and results in the production of a stable food source for bees that is suitable for long-term storage in the hive. Transformation of nectar or honeydew into genuine honey requires a certain amount of time, and the process is referred to as ripening.

21.    The maturation of genuine honey starts with the uptake of nectar or honeydew in the honey bees' stomach while the foraging bees collect their load of nectar in the field and during their return flight. Honey maturation is inseparable from the drying process and involves the addition of enzymes and other bee substances, the lowering of pH through the production of acids in the bee stomach, and the transformation of nectar or honeydew substances. A considerable microbial population exists at the initial stages of the maturation

6

1    process that can be involved in some of these transformations, such as the biosynthesis of
2    carbohydrates.

3        22.    The transformation of nectar into genuine honey is the result of thousands of
4    years of evolution by bees to achieve a long-term provision of food for their own use when
5    there is no nectar flow from the surroundings of the colony. The reduced water content,
6    elevated concentration of sugars, the low pH, and the presence of different antimicrobial
7    substances, make genuine honey a non-fermentable and long-lasting food for bees.

8        23.    During the ripening process, bees also add enzymes including invertase, which
9    helps to convert sucrose into the more stable simple sugars, glucose, and fructose; and glucose
10    oxidase, which is essential for production of gluconic acid and hydrogen peroxide, which
11    prevent fermentation. As nectar is passed from bee to bee, more enzymes are added and more
12    water is evaporated. The allocation and relocation of the content of many cells before final
13    storage is an important part of the ripening process, and it needs sufficient space in the beehive
14    for its normal occurrence.

15        24.    During this time, there are both passive and active mechanisms through which
16    nectar dehydrates. Active dehydration occurs during "tongue lashing" behavior, when worker
17    bees concentrate droplets of regurgitated nectar with movements of their mouthparts. Passive
18    concentration occurs, by contrast, through direct evaporation of nectar stored in cells. As the
19    nectar is dehydrated, the absolute sugar concentration rises rendering the ripening honey
20    increasingly hygroscopic.

21        25.    Bees protect the mature product by sealing off cells filled with honey with a lid
22    of wax. The ripening process concludes when capping has already started. The process of
23    drying normally continues until the honey contains less than 18% water. Drying of honey
24    requires ample space in the hive. During an abundant honey flow, the "honey hoarding"
25    instinct of the bees increases if a storage space in the hive is plentiful. The time that bees need
26    to ripen and cap honey varies greatly depending on climate conditions and the strength of the
27    honey flow. Sufficient time in the hive and multiple manipulations by bees are thus necessary
28    for the transformation of nectar into genuine honey. On average, a hive will produce about

1    65 pounds of surplus honey each year.

2        26.    Because of the unique process by which genuine honey is made, it possesses

3    uniquely desirable properties not present in fake honey products or other sweeteners.

4        27.    The Codex Alimentarius (1981), issued by the Food and Agriculture

5    Organization of the United Nations, is the internationally-accepted standard for the identity

6    of foodstuffs. Based on the process described above, the Codex defines genuine honey as "the

7    natural sweet substance produced by honey bees from the nectar of plants or from secretions

8    of living parts of plants or excretions of plant sucking insects on the living parts of plants,

9    which the bees collect, transform by combining with specific substances of their own, deposit,

10   dehydrate, store and leave in the honey comb to ripen and mature," and states that genuine

11   honey "shall not have added to it any food ingredient, including food additives, nor . . . any

12   other additions . . . than honey."[2]

13       28.    The Codex definition has been accepted by Apimondia, the International

14   Federation of Beekeepers' Associations founded in 1897;[3] the United States Department of

---

[2]   Codex    Alimentarius    (1981),    Codex    Standard    for    Honey,    *available    at*
www.fao.org/input/download/standards/310/cxs_012e.pdf.

[3]Apimondia    Statement    on    Honey    Fraud    (January    2020),    *available    at*
https://www.apimondia.org/latest/honey-a-natural-product    (quoting    Codex    Alimentarius
(1981)).

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

1  Agriculture;[4] and the Food and Drug Administration ("FDA").[5] In 2020, the United States

2  Pharmacopeia also proposed a new FCC Identity Standard that tracks this same definition,

3  which was published in the Food Chemicals Codex in December 2021.

4    29.    True Source Certified Standards similarly define honey as "the natural sweet

5  substance produced by honey bees from the nectar of plants or from secretions of living parts

6  of plants or excretions of plant sucking insects on the living parts of plants, which the bees

7  collect, transform by combining with specific substances of their own, deposit, dehydrate,

8  store and leave in the honey comb to ripen and mature. Honey may not contain, or be

9  combined with foreign sugars and maintain the designation Honey . . . ." The True Source

10  Certified Standards also prohibit "using materials that change the fundamental composition

11  of honey during collection, processing or packing," including "resin processing equipment"

12

_____

13  [4] *See* USDA Commercial Item Description: Honey § 6.1.1 ("CID"), *available at*
   https://www.ams.usda.gov/sites/default/files/media/AA20380_Honey.pdf (Describing the

14  "salient characteristics" of honey as "a sweet, syrupy substance produced by honey bees from
   the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking

15  insects on the living part of plants, which the bees collect, transform by combining with
   specified substances of their own, deposit, dehydrate, store, and leave in the honeycombs to

16  ripen and mature."); *see also id.* at 11-12 (a product bearing the "honey" CID "must specify"
   the "[a]nalytical and authenticity tests to be performed," "[w]hen analytical requirements are

17  different than specified," and "[w]hen emerging analytical methods for economic adulteration

18  [and residues] are to be performed").

19

20  [5] *See* Guidance for Industry: Proper Labeling of Honey and Honey Products at 4 (March
   2018),   *available   at*   https://www.fda.gov/regulatory-information/search-fda-guidance-

21  documents/guidance-industry-proper-labeling-honey-and-honey-products (citing CODEX
   Standard for Honey CODEX STAN 12-1981 and stating, "FDA has concluded that this

22  definition accurately reflects the common usage of the term 'honey.'"); *see also id.* ("a food

23  is adulterated if: (1) a valuable constituent has been omitted in whole or in part from a food;
   (2) if any substance has been substituted wholly or in part; (3) if damage or inferiority has

24  been concealed in any manner; or (4) if a substance has been added to a food so as to increase

25  its bulk or weight, reduce its quality or strength, or make it appear to be better or of greater
   value than it is."); *id.* at 10 ("FDA monitor[s] imported products labeled as honey to ensure

26  that they contain only honey as the sole ingredient[]" through "a long-standing import alert

27  for surveillance of honey for adulteration with cane or corn sugars" (citing Import Alert 36-

28  01 at https://www.accessdata.fda.gov/cms_ia/importalert_108.html)).

9

and "evaporation of moisture in honey."[6]

## II. THE UNITED STATES' HONEY MARKET SUFFERS FROM ECONOMICALLY-MOTIVATED ADULTERATION

30.    Honey is popular in the United States, with annual sales of over $8 billion, and annual consumption of over 1.5 pounds per person, which has doubled since the 1990s.

31.    The United States honey market includes beekeepers, like Plaintiffs Bullfrog Bees, Valor Honey, and Adee; honey importers, like Defendants Sunland and Lamex; honey packers, like Defendants Barkman and Dutch Gold; and honey certifiers, like Defendants True Source, Intertek, and NSF.

32.    Packers purchase honey directly from domestic beekeepers, or purchase honey from importers, who purchase it from foreign producers. Packers then package and distribute honey to retailers under various brand names.

33.    Over the last several years, global production of honey has been steadily decreasing, including in the United States. While the number of hives has remained relatively stable, their yield has dropped drastically due to a variety of factors, including climate change, natural disasters, neonicotinoids, pesticides, mites, colony collapse disorder, reduction of acreage for forage, monodiets, stress, and environmental pollution. For example, while the number of beehives increased about 8% between 2007 and 2014, the average honey yield declined by 37%.

34.    Despite significant reductions in hive yield and productivity, however, honey exports, imports, and total supply have increased over the same time.

35.    Economically-motivated adulteration is the fraudulent, intentional substitution or addition of a substance to a product for the purpose of increasing its apparent value or reducing its cost of production for economic gain.

_____

[6] _See_ True Source Certified Standards V6.1 at pp. 9, 17, 22 (Jan. 1, 2021), _available at_ https://truesourcehoney.com/true-source-certified/standards-2021-01-01.pdf ["2021 True Source Standards"].

36.     Given the high and continually-growing consumer demand for genuine honey, and simultaneous decline in supply of genuine bee-made honey, there is strong economic motivation for firms to produce and pass-off as genuine honey non-honey syrups known as "honey product."[7] Honey product is, essentially, "fake honey" and will be referred to throughout this Complaint as "fake honey."

37.     Despite what should be a clear seller's market as a result of declining yield, domestic commercial beekeepers that produce genuine bee-made honey, like Plaintiffs, are unable to sell their genuine honey at all, or must sell it at a substantial loss, due to the increased competition from cheaper, imported fake honey.

38.     Over the past ten years, global honey imports increased by about 34%, from about 550,000 tons in 2010, to about 730,000 tons in 2019. During this period, the 10 main honey-exporting countries in the Americas (Argentina, Brazil, Canada, Mexico, Chile, Uruguay, Cuba, El Salvador, Guatemala, and Nicaragua) increased their total honey exports by only 6.5%, while the 10 main honey-exporting countries in the Eastern Hemisphere (China, India, Ukraine, Vietnam, Thailand, Turkey, Pakistan, the Russian Federation, Taiwan, and Myanmar) increased their total honey exports by 95.8%.[8]

39.     Another report indicates that from 2007 to 2014, honey exports from China, India, Ukraine, Turkey, Taiwan, Thailand, and Vietnam increased 196% despite the number of beehives in those countries increasing only 13%.[9]

---

[7] "Honey product" was defined in 1996, and again in 2003, to refer to products that "do not meet the compositional criteria for honey; but are products consisting in whole or in part of honey." National Honey Board, "Definition of Honey and Honey Products," *available at* https://www.bjcp.org/mead/honeydefs.pdf.

[8] Evaluation of the Direct Economic Impact of Decreasing Prices of Honey on the Main Honey Export Countries of the Americas. Apimondia, *available at* https://www.apimondia.org/uploads/7/6/4/3/76436993/decreasing_prices_honey_americas.pdf .

[9] García N., A study of the causes of falling honey prices in the international market, Am. Bee J., 877-882 (2016).

11

40.     The increased production of honey abroad is <u>not</u> due to an increase in the number of hives. Rather, these countries have flooded the market with low-priced and low-quality products exported under the name of "honey," but which are not genuine honey. As a result, the global honey market, including the United States' honey market, suffers from widespread economically-motivated adulteration.

41.     There are several indicia of this adulteration. First, there is more honey being sold each year than existing bee populations can produce.

42.     Second, the global market is seeing increases of honey production from areas in which it is not possible. For example, although India does not have the climate or the floral sources to produce large volumes of white and extra light amber honey, its exports of these high-demand, premium honeys have steadily increased in recent years.



Nor does India have clover fields; yet exporters purport to sell Indian "clover honey," although it cannot possibly be authentic.

43.     Third, testing by a variety of entities, including the European Commission and Canadian government, show that much of the honey on retail shelves is not genuine honey. The European Commission's testing and analysis, for example, showed that, of 2,264 honeys

12

1    tested, only 39.4% were compliant with the Apimondia standard of identity.

2        44.    Fourth, although the cost of genuine honey production has substantially

3    increased due to the added cost of preserving bee populations and overcoming colony losses,

4    so that economics theory suggests a higher market price, honey prices have actually

5    decreased.



18       45.    According to the Apimondia's January 2020 Statement on Honey Fraud, honey

19   is the third-most adulterated food in the world.[10] One expert recently estimated that as much

20   as 50% of honey in the market is not genuine.[11]

21       46.    Temptations for honey adulterators have increased in recent years because of the

22   higher prices of genuine honey compared to fake honey, and the obsolescence of official

23   methods to detect instances of fraud. The policing of fraud in relation to honey is challenging

24   and infrequent, making the opportunity attractive to those who wish to commit fraud. Some

25   examples of common modes of production and processing that violate the Codex and result

26

27   [10] Apimondia Statement on Honey Fraud.

28   [11] Ron Phipps, International Honey Market Report, Am. Bee J. (June 2020).

13

in an adulterated, fake honey are as follows:

**Table 1.**

| PRACTICE | HOW IT COMPROMISES THE INTEGRITY OF GENUINE HONEY |
|---|---|
| Harvesting of immature honey as a systematic and purposeful mode of production. | Bees have insufficient time to mature honey and add specific substances of their own by multiple manipulations. As such, the transformation of nectar into genuine honey is never completed and thus, the product cannot be called honey, and is, as described in the Complaint, "fake honey." |
| Artificial feeding of bees during a nectar flow, or in place of nectar flow. | Genuine honey should only be produced by bees from the nectar of plants or from secretions of living parts of plants or excretions of plant-sucking insects on the living parts of plants. |
| Adulteration, with sugars, sweeteners, and syrups. | Nothing should be added to the genuine honey (including substances that are contained naturally in genuine honey). |
| Dehydration of extracted immature honey with technical devices. | Moisture reduction of immature honey is an inseparable part of the maturation process and should be done exclusively by bees. |
| Use of Ion-Exchange Resins to remove residues, offensive aroma, indicators of quality such as 5-hydroxymethylfurfural (HMF), and to lighten the color. | Genuine honey should not be processed to such an extent that its essential composition is changed and/or its quality is impaired. No pollen or constituents particular to genuine honey may be removed. |
| Addition of pollen to honey. | Any additions of pollen to genuine honey through whatever means, which are for the purposes of concealing the origins of honey (including those substances that are contained naturally in honey) can be used to obfuscate the honey authenticity detection process. |
| Heating. | Some genuine honeys are heated to high temperatures, for easier manipulation and to avoid crystallization, but are presented as "raw." When heating honey to high temperatures, *i.e.*, 105 degrees or more, the enzymes naturally found in honey decrease or vanish altogether and should not be called |

14

| PRACTICE | HOW IT COMPROMISES THE INTEGRITY OF GENUINE HONEY |
|---|---|
| | "raw honey." |

47.    Honey imported from overseas is often adulterated—either by having sugars added or by being cleaned, heated, or filtered—and then is blended with small amounts of genuine honey until the sticky, fake honey product is uniform.

48.    Each of the Defendants is aware of and has participated in the fraud. The Importer Defendants know the "honey" they purchase from foreign exporters is fake. The Packer Defendants are likewise aware the "honey" they purchase, blend, and repackage for resale in the retail, wholesale, or bulk ingredient market is fake. And the Certifier Defendants knowingly certify Defendants' fake honey as genuine.

49.    Fake honey that largely consists of cheap sugars processed to have the appearance and consistency of honey—including, for example, honey imported by the Importer Defendants, packed by the Packer Defendants, and certified by the Certifier Defendants—has driven global honey prices into the ground, leaving domestic commercial beekeepers, like Plaintiffs, who produce real bee-made honey, unable or only barely able to sell their genuine honey for a profit. As a result of Defendants' conduct, Plaintiffs and all other similarly-situated domestic commercial beekeepers who produce and sell genuine honey are on the brink of financial collapse, and the world at large faces the catastrophic implications of a bee shortage that could eradicate the world's food supply.

III.    THE DETECTION OF FAKE HONEY

50.    Various methods of testing have been developed to detect honey adulteration—in other words, to distinguish between genuine honey and fake honey.

51.    Elemental Analysis Isotope Ratio Mass Spectrometry ("EA-IRMS"), developed over 25 years ago, has been the traditional method of honey adulteration detection. EA-IRMS detects C4 sugars in honey. True honey comes from flowering plants which produce C3

15

1    sugars, but honey diluted with artificially manufactured syrup, like corn syrup, shows traces
2    of C4 sugars, which render it fake honey.

3        52.    While EA-IRMS was the original standard for honey fraud detection, the recent
4    use of other syrups made from C3 plants to adulterate honey, mainly from rice, has made the
5    detection of fraud much more difficult, since these adulterants are undetectable by EA-IRMS.
6    This makes EA-IRMS largely ineffective at detecting most newer methods of honey
7    adulteration.

8        53.    One of the more promising tools in the detection of food adulteration is nuclear
9    magnetic resonance ("NMR") testing.[12] This technique can measure differing compounds and
10   allow thorough examination of the structural information of compounds contained in a honey
11   sample to determine if it is genuine honey or fake honey. NMR tests for the presence and
12   absence of 37 major components within honey and has the biggest database of any scientific
13   methodology applied to honey. NMR testing is capable of:

14           a.    Detecting the addition of exogenous sugars (from whatever source: cane,
15       corn, beet, wheat, rice, etc.);

16           b.    Confirming the floral origin of honey declared on a product's packaging
17       (single-flower honeys);

18           c.    Detecting irregularities, such as excessive heat treatment (determination
19       of 5-HMF) or fermentation; and

20           d.    Quantifying the main sugars (glucose, fructose, sucrose).

21       54.    The development and application of NMR to the analysis of honey authenticity
22   is ongoing, through collaboration between private, government, and academic laboratories.

23       55.    Despite the superior reliability of NMR testing in detecting fake honey,
24   Defendants have historically suppressed NMR as a viable test, and have chosen instead to use

25
26   _____
     [12] In addition to NMR testing, High Resolution Mass Spectrometry ("HRMS") is considered
27   one of the better tools in detecting honey fraud. HRMS allows combining several individual
     adulteration marker methods to one single multimethod detecting several hundred different
28   adulteration markers simultaneously.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

1   EA-IRMS, knowing the fake honey they deal in could "pass" the less rigorous test.

2      56.    Although NMR testing is far more capable of detecting honey adulteration than

3   EA-IRMS testing, it is not perfect and has, over time, become subject to manipulation,

4   including by Defendants. For example, while NMR initially tested for 37 different parameters

5   to ensure honey authenticity, recently True Source and other Defendants ensured two crucial

6   markers were removed from future testing. This means adulterated honey that may have been

7   flagged by NMR testing in its true form will now "pass" the watered-down NMR test,

8   allowing Defendants to game the test.

9      57.    Additionally, reading the data that result from NMR testing is complicated and

10  requires a level of expertise that few have attained. Someone without appropriate expertise

11  may fail to realize some markers have been removed from the analysis and is likely unable to

12  understand what the underlying data say about the authenticity of the honey sample.

13     58.    As Defendants have figured out how to game NMR testing, making it less

14  effective at detecting adulterated honey, have become increasingly willing to employ it in

15  their businesses, leveraging that willingness to create a false air of concern for authenticity.

16  **IV.    DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES' HONEY**
17  **MARKET**

18     **A.    Industry Members Create True Source in 2010, Purportedly to Address**
19         **Honey Adulteration**

20     59.    For some time, there has been increasing public attention on honey adulteration

21  and fraud. In 2010, four North American honey packers and importers, including defendant

22  Dutch Gold, launched the Honest Honey Initiative and "pledged to help protect the quality

23  and reputation of the U.S. honey supply, as well as the sustainability of U.S. beekeepers and

24  honey businesses."[13]

25     60.    A few months later, the name was changed to True Source Honey, as explained

26

27  ─────────────────────

28  [13] "'Honest Honey' Launched to Protect U.S. Honey Consumers and Customers" (May 6, 2010), *available at* https://truesourcehoney.com/newsroom/release_050610w.php.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

by Jill Clark, of Dutch Gold: "Initially we launched this initiative purely as an educational effort, but due to interest by the industry we feel the need to develop a name that can be trademarked for broader use . . . . Honest honey was not available for trademark use, so we've moved to True Source Honey™, a name which works even better in calling attention to the need for true and legal sourcing of this valuable food."[14]

61.     Part of the impetus for True Source's creation was "Project Honeygate," a two-phase investigation beginning in 2008, led by U.S. Customs and Border Protection and the United States Attorney for the Northern District of Illinois, into a widespread conspiracy to evade anti-dumping duties on Chinese imported honey. In the first phase, federal authorities charged 14 individuals with evading about $80 million in anti-dumping duties. In 2013, during the second phase, five individuals and two packers—Honey Holding and Groeb Farms Inc.—were charged with transshipping honey from China through other countries and mislabeling it to make it appear as though it came from Indonesia, Thailand, or elsewhere, to avoid paying $180 million in anti-dumping duties. Honey Holding and Groeb Farms entered into deferred prosecution agreements and paid $1 million and $2 million in fines, respectively. Notably, the creditors of Honey Holding and Groeb Farms (including Sunland, Lamex and Odem) were, at the time, selling circumvented and adulterated honey to Barkman and Dutch Gold as well.[15]

62.     True Source emerged in the midst of Project Honeygate, claiming to ensure that its members' honey was ethically sourced in a transparent and traceable manner from known beekeepers to consumers, and that the entire supply chain was in full accordance with United States law and without circumvention of trade duties.

---

[14] "'Honest Honey' Changes Name to 'True Source Honey™' To Clarify Goal of Protecting U.S. Honey Consumers and Customers" (July 15, 2010) ["Honest Honey Changes Name"], *at* https://truesourcehoney.com/newsroom/release_071510w.php.

[15] These allegations are included as factual background regarding the formation of True Source. Plaintiffs do not allege any Defendant has transshipped honey or avoided antidumping duties.

63.     Dutch Gold's Jill Clark explained the goals of True Source as follows:

When honey is imported illegally, no-one can be confident of its true source
and quality. Some products are not 100% honey and have other quality
issues[.] . . . We're asking people who buy and love honey to find out more
about how the honey they enjoy is sourced. By raising awareness of unfair
trade practices and taking the True Source Honey pledge, we hope to protect
consumers and manufacturers who use honey, and to preserve the fair honey
trade. . . . We estimate that millions of pounds of Chinese honey continue to
enter the U.S. from countries that do not have commercial honey businesses[.]
. . . For example, countries such as Indonesia, Malaysia, Taiwan, Thailand,
the Philippines and Mongolia raise few bees and have no history of producing
honey in commercial quantities, yet have recently exported large amounts of
honey to the United States.[16]

64.     In November 2010, True Source announced a certification program, "True
Source Certified," which it said was "designed to certify the origin, food safety and purity of
the honey being distributed and consumed within North America."[17] The program
purportedly provides a traceability system for participants who wish to demonstrate through
a supposedly independent, third-party audit that their sourcing practices are in compliance
with requirements of the True Source Certified Standard. This traceability system claims to
be designed to allow honey to be tracked from the consumer, back through the supply chain,
to the country of origin and to the beekeeper who harvested the honey from the beehive.

65.     Although True Source was originally concerned with the illicit transshipment of
honey, its focus has now shifted to honey fraud, as evidence of widespread adulteration has
come to light.

66.     Participants of True Source Certified are required to comply with specific

---

[16] *Id.*

[17] "True Source Honey Will Launch Certification Program To Help Stem the Tide of Illegal
Honey"        (November        12,        2010),        *available        at*
https://truesourcehoney.com/newsroom/release_111210.php.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

standards (the "True Source Certified Standard").[18] Generally: (1) participating beekeepers are required to produce and sell authentic honey directly from their own operations; (2) certified processors/exporters are required to purchase honey only from participating beekeepers; (3) participating importers are required to purchase honey only from certified processors/exporters; and (4) certified packers are required to purchase honey only from certified processor/exporters, registered importers, and registered beekeepers.

67.     <u>Participation for Beekeepers</u>. "Beekeeper," as defined under the True Source Certified Standard, refers to the "[p]rimary producer with direct ownership or control of honey production."[19] In order to be registered with True Source as participating members, beekeepers must produce and sell authentic honey directly from their own operations; must follow all applicable laws pertaining to the production, sale, and/or export of honey; and must ensure that each load sold is accompanied by a bill of lading with the beekeeper and purchaser's name and address, drum count, and weight.[20]

68.     <u>Certification for Processors/Exporters</u>. "Processor/Exporter," as defined under the True Source Certified Standard, refers to a "company located outside the United States that operates a bulk plant/factory for purposes of preparing honey for export."[21] In order to be True Source Certified, processors/exporters are required to establish a system of traceability; clearly label all individual drums of honey with certain information (including country of origin); seal each load of honey with the True Source Certified Seal and True Source Seal Number, which is assigned by True Source to each full ocean container load or full truckload of honey exported by certified processors/exporters; maintain and attach to the

---

[18] *See* 2021 True Source Standards.

[19] *Id.*

[20] *Id.*

[21] *Id.*

True Source Certified Seal Database[22] certain export documentation (including ocean/truck bills of lading and analysis reports on the honey's origin and authenticity); and participate in a third-party certification audit and an annual recertification audit (among other things).[23]

69.     The third-party certification audit for processors/exporters involves several key components:

        a.      Evaluating the processor/exporter's system of traceability;

        b.      Collecting random samples of unprocessed honey inventory to test for country of origin and authenticity using pollen analysis;

        c.      Confirming that the processor/exporter is not using processing equipment or technology that changes the fundamental composition of honey (e.g., the use of resin technology); and

        d.      Confirming that the processor/exporter maintains and demonstrates a system to ensure honey authenticity.[24]

70.     Once a honey packer is True Source Certified, it is subject to an annual announced surveillance (recertification) audit.[25]

71.     True Source Certified processor/exporters are required to purchase honey only from True Source participating beekeepers.

72.     <u>Participation for Importers</u>. "Importer," as defined under the True Source Certified Standard, refers to a "company that purchases honey from a processor/exporter and is responsible for (1) ensuring the imported goods comply with local laws and regulations, (2) filing a completed duty entry and associated documents, and (3) paying the assessed

---

[22] The True Source Certified Seal Database is True Source's data entry system verifying each link of the supply chain through seal reconciliation.

[23] 2021 True Source Standards.

[24] *Id.*

[25] *Id.*

21

import duties and other taxes on those goods and then selling the honey to packers."[26] In order to be registered with True Source as participating members (and obtain a "certificate of participation"), honey importers are required to:

      a.     Purchase honey from "Approved Countries";

      b.     Maintain the True Source Certified Seal Database; and

      c.     Maintain and attach to the True Source Certified Seal Database certain required documents, including ocean/truck bills of lading (which must contain True Source seal numbers) and analysis reports on the honey's origin and authenticity.[27]

73.     Importers that are participating members of True Source must buy only from True Source Certified processor/exporters and sell only to True Source Certified packers.[28]

74.     Defendants Sunland, Lamex, and Odem are participating members of True Source, and Sunland and Odem have company representatives on the board of True Source. Odem claims to be a "2010 Co-founder of True Source."[29]

75.     <u>Certification for Packers</u>. "Packer," as defined under the True Source Certified Standard, refers to a "company in North America that is involved in purchasing, blending, processing and repackaging raw honey in preparation for the retail, wholesale or bulk ingredient market."[30] In order to be True Source Certified, packers are required to:

      a.     Ensure their honey sourcing comes from True Source participants, *i.e.*, certified processor/exporters, registered importers, and registered beekeepers;

      b.     Purchase honey from certain "Approved Countries";

      c.     Maintain a system of traceability;

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] https://www.odeminternational.com/the-company

[30] *Id.*

d.      Maintain the True Source Certified Seal Database;

e.      Maintain documentation for every purchase shipment of raw honey (e.g., ocean/truck bills of lading, which must contain the True Source Certified seal number, and analysis reports on the honey's origin and authenticity);

f.      Allow entry to an audit firm for unannounced sampling; and

g.      Successfully complete certification an audit by a third-party audit firm.[31]

76.     The third-party certification audit for packers involves several key components:

a.      Evaluating the packers' system of traceability;

b.      Confirming that each load purchased and imported has an associated True Source Certified seal number;

c.      Collecting random samples of unprocessed honey inventory to test for country of origin using pollen analysis;

d.      Confirming that the packer is not using processing equipment or technology that changes the fundamental composition of honey (e.g., the use of resin technology); and

e.      Confirmation that the packer maintains and demonstrates a system to ensure honey authenticity.[32]

77.     Once a honey packer is True Source Certified, it is subject to an annual announced surveillance (recertification) audit.[33]

78.     True Source Certified packers are required to purchase honey only from True Source participating importers, certified domestic beekeepers, and certified processors/exporters.

79.     Defendants Barkman and Dutch Gold are True Source Certified packers.

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

80.     True Source Certified was launched in January 2011.[34] As an integral part of the certification process, True Source engages third party testers and auditors, including Intertek and NSF, directing them to conduct audits of True Source Certified honey packers and their supplying beekeepers located within the state of California.[35] For example, upon launching True Source Certified, True Source announced that, "For those applying for certification, Intertek will conduct unannounced inspections, review documents and collect samples for country-of-origin verification."[36]

81.     Intertek and NSF knowingly and intentionally conduct their testing and auditing in a manner that conceals evidence of adulteration. For example, Intertek has traditionally used only the outdated and ineffective EA-IRMS testing method, which is incapable of detecting all methods of honey adulteration and fraud, instead of the more sophisticated NMR testing, to test honey samples for the purpose of awarding True Source Certification. To the

_____

[34] "True Source Honey Launches Certified Honey Traceability Program To Protect Honey Consumers and Customers" (January 11, 2011) ["Certified Honey Traceability Program"], *available at* https://truesourcehoney.com/newsroom/release_011111.php.

[35] Beekeepers selected to participate in a packer audit must allow auditors to inspect facilities and records to verify the beekeeper has enough hives to support the volume of honey sold. 2021 True Source Standards at 27-28. Such California beekeepers include at least the following: A & Bee Provisions; Arrowsmith & Sons Apiaries; Ashurst Honey Co.; Bee-lieve Apiary LLC; Bloom Honey, LP; Brock Ashurst Bees; BWB Honey Company; Cary's Honey Farms, Inc.; Chavinda HoneyBee Farms Inc.; Colony & Keeper; Delgado's Bee Farm; Dion Ashurst Farms; Eli Figeuroa's Bee Service; Elsi Bees; Fairview Honey; Foothills Honey Company; Glory Bee Co. LLC; Godlin Bees, Inc.; Gonzalez Apiaires; Inland Bees Inc.; Island District Honey Company; Jaynes Honey Co.; Jim's Honey Farm LLC; John Bradley; Lee Parrish Beekeeping; Lucian Nastase; M & M Apiary LLC; Marquette Bees, Inc.; Matthew T Sheilds; McWilliams Honey Company; Mickey Bee LLC; Norcalbees; Olivarez Honey Bees; Palmer Honey Company; Reynaga Apiaries; Royal Honey; Russell Allen; Sage Mountain Apiaries; Sample Family Apiaries; Soffel Farms Inc.; Steve Blair; Steve E Park Apiaries; Strachan Apiaries, Inc.; T & B Apiaries; Tim Fenston; Traveling Honey Bee's Inc.; Travis Soffel; Ubees California LLC; UHB, LLC; West Apiaries; and Wonderful Bees. *See* http://www.tshmember.com/beekeepers.php.

[36] Certified Honey Traceability Program, *supra* n.33.

24

extent Intertek has used NMR testing, it has used a watered-down version that has crucial detection markers removed, and the underlying data are not being properly analyzed by someone adequately qualified to detect the missing markers and correctly interpret the results.

82. In one example of the scheme, NSF conducted a series of inspections and evidence indicating some honey being tested for True Source Certification was fake, but at the direction of True Source, failed to note this evidence in its reports, allowing the True Source Certified Seal to be applied to this fake honey, and allowing the Importer and Packer Defendants to sell this fake honey as authentic.

83. Further dubious are the audits (conducted by NSF) used to ensure traceability of honey back to the beekeeper, ensure the honey is not being compromised in any way to constitute adulteration, and ensure the honey supply chain is secure from actors who may wish to adulterate or substitute adulterated product for genuine honey. NSF claims to be able to trace the honey back to the beekeeper, but this is not possible when both the exporters and packers are blending honey from multiple beekeepers. Often, the honey put out by the Packer Defendants is labeled (for example) as follows: "Product of the United States, Canada, Brazil, Argentina and India." The idea that honey could be traceable, when it comes from multiple countries, strains credulity. Intertek is supposedly testing samples at various points in the honey supply chain and reporting on these tests back to True Source. If the audits done by NSF and the testing done by Intertek were in fact done ethically and properly, very little fake honey would be available in the United States. NSF and Intertek are willfully blind to the very thing they are supposed to oversee for True Source, undermining the integrity of the entire certification program.

84. The True Source Certified Seal has been applied to the Importer Defendants' and the Packer Defendants' fake honey, which has been distributed and sold throughout the United States, including in California. In approving such products to bear its Certification Seal, True Source is aware the products are not authentic honey.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

85.     True Source certifies honey packers in California[37] and issues certificates of participation to participating honey importers in California,[38] knowing those companies' products will be and are directed at California consumers while bearing the True Source Certified Seal. True Source encourages, intends for, and knows that the True Source Certified honey packers (including the Packer Defendants) use their certification seals to engage in marketing efforts within the State of California.

86.     True Source strictly controls the use of its True Source Certified Seal, including in "Retail markets," providing detailed "guidelines [that] must be strictly observed when using the True Source Certified® logo."[39] True Source claims that the True Source Certified Seal may only be applied to products which are 100% pure, authentic honey.

87.     True Source also promotes itself to major retailers throughout the country and California, touting its certification program "as a distinctive point of difference in reach discerning consumers,"[40] and encouraging retailers to purchase only True Source Certified honey. As a result of its efforts, many retailers, including Costco, have adopted a policy of buying only True Source Certified honey.

88.     NSF and Intertek audit and test True Source Certified honey sold in California.

**B.     The Certifier Defendants' Scheme to Defraud**

89.     Although it purports to be a watchdog of the honey industry, True Source in fact regularly and intentionally fails to monitor its members for actual compliance with the True Source Certification Program requirements and has regularly and intentionally failed to

---

[37] True Gold Honey, Inc was a California True Source certified packer during the Class Period.

[38] California True Source certified importers include at least BCD Foods, Impex Group, Ortega's Ultimate Trading, Toshuku America, Inc., and True Minh Inc. *See* http://www.tshmember.com/importers.php.

[39] *See* 2021 True Source Standards at 31-37.

[40] https://truesourcehoney.com/true-source-certified/.

26

implement its testing protocol as described above, to increase its profits and those of its honey packer and importer members, including Defendants. Far from being an independent organization conducting audits of third parties, True Source is entirely self-regulating. The True Source Board of Directors is composed of representatives of the same entities (including the Importer Defendants and Packer Defendants) that it is supposed to audit. This creates an inherent conflict of interest which Defendants have leveraged to their great advantage.

90.     Faced with increasing press coverage of honey fraud and mounting industry pressure about proper testing of honey imports, on December 14, 2020, True Source issued a self-serving press-release-style advertisement in the American Bee Journal, saying it was "updating its certification standards in 2021" to test authenticity of imported honey "by an accredited laboratory at some point in the supply chain using either EA-IRMS and Nuclear Magnetic Resonance (NMR) profiling or EA-IRMS and High Resolution Mass Spectrometry (HRMS) analysis."[41] The ad quotes Gordon Marks, executive director of True Source, as saying that "The new standards specify authenticity testing which utilizes longstanding approved methods along with cutting-edge technologies to detect sugars/syrups."[42]

91.     Contrary to the advertisement, however, for over a decade, True Source has downplayed the importance of the "cutting edge" NMR testing, and its members, including Gordon Marks, have publicly stated that NMR testing is not necessary or superior to other forms of testing, like EA-IRMS, even though that method is objectively inferior. While NMR, if properly run and the data appropriately analyzed, is effective at detecting adulteration and fraud, EA-IRMS is easy to circumvent.

92.     True Source has long failed to implement more effective testing methods like NMR because True Source does not want its fraud revealed, since more accurate methods are

---

[41] "True Source Honey to Update Certification Standards in 2021" (Dec. 14, 2020) ["Update to Certification Standards"], *available at* https://americanbeejournal.com/true-source-honey-to-update-certification-standards-in-2021.

[42] *Id.*

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

able to show that the honey it is certifying is fake honey. Moreover, True Source is aware that its certified members can manipulate, and in many instances have manipulated, the findings of an NMR test by requesting that the testing/auditing companies (*i.e.*, Intertek and NSF) test only certain components that would allow their honey to pass muster, while failing to undertake a comprehensive analysis that would produce a full NMR profile and be able to conclusively detect fraud. Intertek and NSF are fully aware this kind of partial NMR testing allows honey fraud to go undetected.

93.     The True Source Board of Directors meets annually during the first week of January, typically, the day before the American Honey Producers Association's annual convention, and then again in June. Until recently, members of the True Source Board of Directors pretended to be skeptical of NMR technology, assailing it as unreliable, even while knowing NMR not only is reliable, but that it would reveal the honey adulteration and fraud perpetuated by True Source members, including the Importer and Packer Defendants. In particular, Eric Wenger (Barkman Director of Honey Procurement), Nicholas Sargeantson (Sunland President), and Jill Clark (Dutch Gold Vice President of Sales and Marketing) participated in these discussions.

94.     True Source's knowledge of the ongoing fraud in the honey industry was summed up by Gordon Marks himself: "While most honey comes from high-quality, legal sources, adulterated honey and illegally sourced honey remains a global issue that undercuts fair market prices and damages honey's reputation for quality and safety."[43]

95.     True Source, in conjunction with Intertek and NSF, has certified and continues to certify as True Source Certified certain honey packers, including the Packer Defendants, as well as exporters of adulterated honey, and has issued and continues to issue certificates of participation to participating importers, including the Importer Defendants, even though True Source is aware they do not meet the standards for True Source Certification and Participation.

---

[43] Update to Certification Standards, *supra* n.4041.

28

96.    True Source is fully aware its Certification and Participation program has been and continues to be used by member honey packers and importers, including the Importer Defendants and Packer Defendants, to misrepresent the authenticity of their fake honey, and has allowed its members to use the True Source Certified Seal to mislead businesses and consumers into believing the honey they purchase is authentic, when it is not.

97.    NSF is fully aware that its audits are inadequate to detect all methods of honey adulteration and fraud, and that its inadequate audits are being used to fabricate the authenticity of True Source members' fake honey, including the Importer and Packer Defendants' fake honey. In fact, throughout the Class Period, NSF has also accepted bribes from True Source Certified exporters, including exporters who sell "honey" to Defendants, to conduct sham audits designed to show their honey is genuine, when in fact it is adulterated with extraneous, non-honey syrups, and/or treated with resin technology. True Source enables this conduct by providing NSF with a PowerPoint presentation outlining the cursory auditing process it must use to ensure any exporter or packer will "pass" (i.e., to ensure that the exporter's or packer's honey is labeled genuine when in fact it is not), and NSF has in fact routinely followed these instructions throughout the Class Period with respect to True Source Certified exporters, whose "honey" is purchased by Defendants and is ultimately sold to United States consumers as genuine honey.

98.    For example, Shakti Apifoods Pvt Ltd, a True Source Certified exporter based in Amir Nagar, India, offered bribes that were accepted by NSF to ensure its honey was classified as True Source Certified, during the Class Period. Lamex regularly purchases "honey" from Shakti Apifoods Pvt Ltd, knowing it contains extraneous syrups and/or is processed with resin technology, yet continues to sell it to various entities in the United States' honey market, including in California, during the Class Period.

99.    Intertek, in turn, tests the honey sold by True Source Certified exporters and packers, including the Packer Defendants. Rather than engaging in legitimate testing for honey authenticity, Intertek falsely reports that the honey is not adulterated, without providing underlying data or analysis.

100.   At a True Source meeting in Florida in January 2015, Prakash Kejriwal of Kejriwal Bee Care India (Pvt.) Ltd. introduced a Powerpoint presentation entitled Residue Removal from Honey through Chinese Resin Technology, which touted the use of resin technology to remove residues and "bring down the honey color," falsely claiming the FDA had approved it.

101.   In fact, Charlotte Liang, a chemist at the FDA, stated in a February 23, 2016 letter to Ron Phipps (Vice-President of the Apimondia Scientific Commission on Beekeeping Economy) that "calling the product that has been treated with the resin technology simply honey would not accurately identify food generally understand [*sic*] to be honey. The product should be labeled with a name that sufficiently describes its characterizing properties in a way that distinguishes it from honey which has not been treated with resin technology."

102.   Mr. Kejriwal's promotion of resin technology was not questioned by True Source but encouraged. Indeed, the Board later appointed Mr. Kejriwal as the Vice Chair of True Source, a position he currently holds, replacing Norberto Garcia.[44] Mr. Garcia's removal was significant because he had begun presenting compelling evidence of adulteration in the international honey market, including evidence of transshipment and the use of resin technology.

103.   Prior to his removal from True Source, Mr. Garcia spoke at a True Source meeting in San Diego in 2018, attended by representatives from at least the following Defendants: True Source, Sunland (Nicholas Sargeantson), Lamex (Greg Olson), Odem (Elise Gagnon), Barkman (Eric Wenger), and Dutch Gold (Jill Clark). Also in attendance were representatives from Indian and Vietnamese honey suppliers. The Indian exporters present at the meeting stated that if immature, unripened honey is considered adulterated—which it is—then 100% of India's honey exports are adulterated. Also at this meeting, NSF reported that it had observed extraneous syrups and resin technology in Indian honey

---

[44] Mr. Garcia is the Senior Consultant of NEXCO S.A., an Argentine honey exporter, President of the International Honey Exporters Organization (IHEO), and President of the APIMONDIA Working Group on Adulteration of Bee Products.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

factories, and asked True Source if those observations should be included in written audit reports. True Source instructed NSF not include any such observations in its written reports.

104.   Thus, while publicly lamenting that "ensuring honey authenticity is one of the greatest challenges facing the honey industry" because "there is no single universal analytical method available which is capable of detecting all types of adulterants in honey with adequate sensitivity,"[45] True Source actually leverages this deficiency in the detection of honey adulteration to approve its members' fake honey for certification.

105.   In furtherance of Defendants' conspiracies and schemes, True Source, in conjunction with Intertek and NSF, engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, by using or causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to assist in the repeated, systematic, and fraudulent distribution and sale of fake honey to businesses and persons throughout the United States.

106.   Specifically, in furtherance of the scheme, True Source, Intertek, and NSF created, maintained, and transmitted through the mail and wires fake and fraudulent papers to misrepresent fake honey as authentic. This includes at least ocean or truck bills of lading, invoices, delivery orders, warehouse inbound receipts, EA-IRMS Reports, HRMS reports, and NMR reports.

## C.   The Importer Defendants' Scheme to Defraud

107.   The Importer Defendants are some of the largest honey importers in North America. Each of the Importer Defendants is a participating member of True Source.[46]

---

[45] *See* https://truesourcehoney.com/the-issue. True Source recently sponsored a "Honey Adulteration Symposium" at University of California, Davis, on April 22, 2021, ostensibly to bolster its false commitment to combatting honey fraud.

[46] *See* Rising Tide of Honey Laundering, Descartes Datamyne (November 18, 2011), *available at* https://www.datamyne.com/blog/data-applications/rising-tide-of-honey-laundering; *see also* Participating Importers, True Source, *available at* http://www.tshmember.com/importers.php.

108.   The Importer Defendants hold themselves out as honest dealers in the honey industry, committed to ensuring the authenticity of their honeys.

109.   Sunland represents that its "imports are meticulously controlled for quality and traceability, with suppliers vetted in accordance with FDA guidelines and our own exacting standards," and that, "As a member of True Source Honey, Sunland is involved in leading the honey industry's efforts to protect the reputation of legitimately imported honey."[47]

110.   Lamex claims its "sources are up to welfare, traceability, quality, and nutrition standards demanded by consumers."[48]

111.   Odem represents that it "is working closely with organizations that are fighting illegal honey imports, [and] with the authorities responsible for quality control," and that it "commits itself to create a healthier environment by fighting illegal honey trade. The company is taking an active part in associations such as True Source Honey, a key player in this conflict resolution."[49]

112.   Despite these claims, the Importer Defendants have engaged in a fraudulent scheme to import fake honey into the United States, knowingly importing honey that contains extraneous syrups and/or processed with resin technology. Moreover, the "honey" imported by the Importer Defendants from Indian and Vietnamese honey suppliers is immature and unripened. Despite knowledge their "honey" is not genuine, Importer Defendants have sold and continued to sell its honey products to purchasers in the United States during the Class Period.

113.   At the request of Barkman, Odem's honey was tested in June 2018 by an accredited food testing laboratory using NMR technology and 24 of its samples originating from India were found to be adulterated with added sugar syrup. After receiving the results, Barkman ceased contact with the laboratory and turned instead to Intertek to provide testing,

---

[47] http://www.sunlandhoney.com.

[48] https://tinyurl.com/bdk9t2p2.

[49] https://www.odeminternational.com/the-company

32

knowing that Intertek would provide the results it was looking for. Barkman went on to sell the adulterated honey it purchased from Odem to purchasers in the United States during the Class Period.

114.   Nicholas Sargeantson of Sunland admitted in January 2010 that there is no white or extra light amber honey that originates from India, Vietnam, or Thailand, however Sunland continues to import such "honey" from those countries.

115.   Other True Source members' brands of fake "honey" products have also been tested by an accredited laboratory and found to be adulterated, including at least Clover Valley, Burleson, Parade, and Glory Bee "honey."

116.   Notwithstanding, the Importer Defendants have used and continue to use the True Source Certified Seal to falsely represent that their fake honey products are genuine honey.

117.   The Importer Defendants knowingly, intentionally, and repeatedly conspired with True Source and the Packer Defendants to introduce fake honey into the United States' honey market.

118.   The Importer Defendants know their honey products are fake, based in part on the low price of the exported honey they purchase in relation to the fair market price of genuine honey.

119.   In furtherance of Defendants' conspiracies and schemes, the Importer Defendants engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, by using or causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute and sell fake honey to packers and other businesses throughout the United States.

120.   The Importer Defendants have actively concealed their repeated, systematic, and fraudulent distribution and sale of fake honey by creating, maintaining, and transmitting through the mail and wires fake and fraudulent bills of lading, invoices, packing lists, and other papers to falsely and fraudulently represent fake honey products as genuine.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

121.   Sunland has routinely and knowingly purchased fake honey from True Source Certified exporters for sale in the United States' honey market. Examples of these fraudulent transactions include:

a.   On June 7, 2020, Sunland received 186 drums of "Natural Indian Bees Honey" from Allied Natural Product, a True Source Certified exporter based in New Delhi, India (bill of lading number: HLCUDE1KD04404AA) (True Source Certified Number C0288576-TSH). The port of discharge was in Jacksonville, Florida. On or about April 2016 (and annually thereafter), True Source certified and recertified Allied Natural Product as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Sunland knew Allied Natural Product's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

b.   On September 3, 2019, Sunland received 64 drums of "Natural Honey" (Extra Light Amber) from Kejriwal Bee Care India (Pvt.) Ltd., a True Source Certified exporter based in New Delhi, India (bill of lading number: CMDUAMC0760419) (True Source Certified Number C0238179-TSH). The port of discharge was in Norfolk, Virginia. On or about September 2011 (and annually thereafter), True Source certified and recertified Kejriwal Bee Care India (Pvt.) Ltd. as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Sunland knew Kejriwal Bee Care India (Pvt.) Ltd.'s "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

c.   On September 1, 2019, Sunland received 124 drums of "honey" from PHONGSON Co., Ltd., a True Source Certified exporter based in Lâm Đồng, Vietnam (bill of lading number: PRFTPFSPDX980090) (True Source Certified Number C0238191-TSH). The port of discharge was in Seattle, Washington. On or about May

34

2014 (and annually thereafter), True Source certified and recertified PHONGSON Co., Ltd. as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Sunland knew PHONGSON Co., Ltd.'s "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

   d. On September 1, 2019, Sunland received 122 drums of "Vietnamese Amber Honey" from Nhieu Loc Company Limited, a True Source Certified exporter based in Ho Chi Minh City, Vietnam (bill of lading number: PRFTPFSPDX980060) (True Source Certified Number C0251262-TSH). The port of discharge was in Seattle, Washington. On or about September 2015 (and annually thereafter), True Source certified and recertified Nhieu Loc Company Limited as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Sunland knew Nhieu Loc Company Limited's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

   e. On August 29, 2019, Sunland received 63 drums of "Vietnamese Honey" from Hoang Tri Honey Bee Company Limited, a True Source Certified exporter based in Đồng Nai, Vietnam (bill of lading number: PRFTPFSCHS970870) (True Source Certified Number C0238189-TSH). The port of discharge was in Charleston, South Carolina. On or about March 2014 (and annually thereafter), True Source certified and recertified Hoang Tri Honey Bee Company Limited as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Sunland knew Hoang Tri Honey Bee Company Limited's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

f.      The above represent just a sample of Sunland and the Certifier Defendants' systematic acts of mail and/or wire fraud during the Class Period.

122.    Lamex has also routinely and knowingly purchased fake honey from True Source Certified exporters for resale in the United States' honey market. Examples of these fraudulent transactions include:

a.      On June 22, 2020, Lamex received 248 drums of "Vietnamese Conventional Light Amber Honey" from Daklak Honeybee Joint Stock Company, a True Source Certified exporter based in Đắk Lắk, Vietnam (bill of lading number: PRFTPFSPDX050590) (True Source Certified Number C0228527-TSH). The port of discharge was in Portland, Oregon. On or about September 2014 (and annually thereafter), True Source certified and recertified Daklak Honeybee Joint Stock Company as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex further understood Daklak Honeybee Joint Stock Company's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

b.      On June 12, 2020, Lamex received 128 drums of "Natural Honey" from Ambrosia Natural Products India Pvt. Ltd., a True Source Certified exporter based in New Delhi, India (bill of lading number: MOCO390710000806) (True Source Certified Number C0372215-TSH). The port of discharge was in Newark, New Jersey. On or about January 2018 (and annually thereafter), True Source certified and recertified Ambrosia Natural Products India Pvt. Ltd. as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex knew Ambrosia Natural Products India Pvt. Ltd.'s "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

   c. On June 6, 2020, Lamex received 122 drums of "Vietnamese Conventional Light Amber Honey" from Southern Honey Bee Co., LTD., a True Source Certified exporter based in Ho Chi Minh City, Vietnam (bill of lading number: PRFTPFSCHI050370) (True Source Certified Number C0238188-TSH). The port of discharge was in Tacoma, Washington. On or about January 2013 (and annually thereafter), True Source certified and recertified Southern Honey Bee Co., LTD. as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex knew Southern Honey Bee Co., LTD.'s "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

12

13

14

15

16

17

18

19

20

21

22

   d. On June 4, 2020, Lamex received 124 drums of "Natural Honey" from Kejriwal Bee Care India (Pvt.) Ltd., a True Source Certified exporter based in New Delhi, India (bill of lading number: SYXOSSPLD0301744) (True Source Certified Number C0238179-TSH). The port of discharge was in Seattle, Washington. On or about September 2011 (and annually thereafter), True Source certified and recertified Kejriwal Bee Care India (Pvt.) Ltd. as True Source Certified, knowing its "honey" to is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex knew Kejriwal Bee Care India (Pvt.) Ltd.'s "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

23

24

25

26

27

28

   e. On May 28, 2020, Lamex received 186 drums of "Vietnamese Light Amber Honey" from Nhieu Loc Company Limited, a True Source Certified exporter based in Ho Chi Minh City, Vietnam (bill of lading number: PRFTPFSCHI050210) (True Source Certified Number C0251262-TSH). The port of discharge was in Tacoma, Washington. On or about September 2015 (and annually thereafter), True Source certified and recertified Nhieu Loc Company Limited as True Source Certified,

37

knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex knew Nhieu Loc Company Limited's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

   f.  On May 31, 2020, Lamex received 62 drums of Conventional Light Amber Honey from Shakti Apifoods Pvt Ltd, a True Source Certified exporter based in Amir Nagar, India (bill of lading number: FORLDEL19201377). The port of discharge was in Newark, New Jersey. True Source certified and recertified Shakti Apifoods Pvt Ltd as True Source Certified, knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Lamex knew Shakti Apifoods Pvt Ltd's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

  123. The above represents just a sample of Lamex and the Certifier Defendants' systematic acts of mail and/or wire fraud during the Class Period.

  124. Odem has also routinely and knowingly purchased fake honey from True Source Certified exporters for sale in the United States' honey market. Examples of these fraudulent transactions include:

   a.  On December 29, 2020, Odem received 252 drums of "Natural Honey" from Ambrosia Natural Products India Pvt Ltd, a True Source certified exporter based in New Delhi, India (bill of lading number: MOSJ390710002155) (True Source Certified Number C0372215-TSH). The port of discharge was in Norfolk, Virginia. On or about January 2018 (and annually thereafter), True Source certified and recertified Ambrosia Natural Products India Pvt Ltd as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Odem knew Ambrosia Natural Products India Pvt Ltd's "honey" contained extraneous syrups and/or was processed

<div align="center">38</div>

with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

b.    On December 29, 2020, Odem received 124 drums of "homogenized natural" "honey" from Brij Honey Pvt Ltd, a True Source certified exporter based in Bharatpur, India (bill of lading number: MOSJHAR3322021) (True Source Certified Number C0238183-TSH). The port of discharge was in Philadelphia, Pennsylvania. On or about December 2017 (and annually thereafter), True Source certified and recertified Brij Honey Pvt Ltd as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Odem knew Brij Honey Pvt Ltd's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

c.    On October 18, 2020, Odem received 128 drums of "Vietnamese Honey" from Hoang Tri Honey Bee Co Ltd, a True Source certified exporter based in Biên Hòa city, Vietnam (bill of lading number: CTCGCTCHOU090390) (True Source Certified Number C0238189-TSH). The port of discharge was in Houston, Texas. On or about March 2014 (and annually thereafter), True Source certified and recertified Hoang Tri Honey Bee Co Ltd as True Source Certified, knowing its "honey" is fake or adulterated, and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Odem knew Hoang Tri Honey Bee Co Ltd's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

d.    On August 19, 2020, Odem received 66 drums of "Bees Honey from Vietnam" from Huong Rung Co Ltd, a True Source certified exporter based in Long Khánh, Vietnam (bill of lading number: CTCGCTCPHI070140) (True Source Certified Number C0327372-TSH). The port of discharge was in Philadelphia, Pennsylvania. On or about March 2017 (and annually thereafter), True Source certified

and recertified Huong Rung Co Ltd as True Source Certified, knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Odem knew Huong Rung Co Ltd's "honey" contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

e.    On July 16, 2020, Odem received 66 drums of "Bees Honey" from Bao Nguyen Honeybee Co Ltd, a True Source certified exporter based in Tân Uyên, Vietnam (bill of lading number: CTCGCTCPHI060100) (True Source Certified Number C0288565-TSH). The port of discharge was in Norfolk, Virginia. On or about February 2017 (and annually thereafter), True Source certified and recertified Bao Nguyen Honeybee Co Ltd as True Source Certified, knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration. Odem knew Bao Nguyen Honeybee Co Ltd's "honey" to contained extraneous syrups and/or was processed with resin technology, yet knowingly sold it to various entities in the United States' honey market, including in California.

125.    The above represent just a sample of Odem and the Certifier Defendants' systematic acts of mail and/or wire fraud during the Class Period.

**D.    The Packer Defendants' Scheme to Defraud**

126.    The Packer Defendants are some of the largest honey packers in North America and sell honey directly to retailers, in direct competition with Plaintiffs. Each of the Packer Defendants is True Source Certified.[50]

127.    The Packer Defendants hold themselves out as honest dealers in the honey industry, committed to ensuring the authenticity of their honey.

---

[50] http://www.tshmember.com/packers.php

128.   Barkman states that all of its honey "is True Source Certified and fully traceable back to its origin. For us, it's a badge of honor. For you, it's peace of mind."[51]

129.   Dutch Gold states that it "is True Source Certified to protect our customers and consumers by ensuring to our utmost ability that honey is ethically sourced in a transparent and traceable manner from known beekeepers and brokers; that honey moves through the supply chain in full accordance with U.S. law and without circumvention of trade duties; that it carries truthful labeling as to its source, has been tested to ensure quality, and has been handled in a safe and secure manner from hive to table."[52]

130.   Despite these claims, the Packer Defendants have engaged in a fraudulent scheme of knowingly and intentionally purchasing fake honey from unscrupulous importers, and blending, processing, and repackaging such fake honey with honey produced by Plaintiffs and other domestic commercial beekeepers, for sale in the retail market.

131.   In September 2020, Dutch Gold "honey" from Vietnam and India was tested by an accredited laboratory and found to contain extraneous non-honey syrups, meaning it is adulterated, fake honey.

132.   Barkman's Busy Bee brand "honey" from India has also been tested by an accredited laboratory and found to be adulterated with extraneous non-honey syrups.

133.   Moreover, and as previously discussed herein, Barkman sold honey it purchased from Odem that was found to be adulterated with added sugar syrups to purchasers in the United States during the Class Period.

134.   Barkman's Director of Quality and Honey Procurement Eric Wenger has solicited independent food testing laboratories to provide false results for its "honey" products.

135.   As alleged above, each of the Packer Defendants' have manufactured honey products that have tested positive for adulteration. Despite this, the Packer Defendants have

[51] http://www.barkmanhoney.com/about/our-promise

[52] https://dutchgoldhoney.com/about-us/#certifications

41

used and continue to use the True Source Certified Seal to falsify the authenticity of their fake honey.

136.   The Packer Defendants knowingly, intentionally, and repeatedly conspired with the Certifier Defendants and the Importer Defendants to introduce fake honey into the United States' honey market.

137.   On or about October 2011, and annually thereafter, True Source certified and recertified Barkman as True Source Certified, knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration.

138.   On or about November 2011, and annually thereafter, True Source certified and recertified Dutch Gold as True Source Certified, knowing its "honey" is fake or adulterated and having caused NSF and Intertek to engage in sham auditing and testing to obscure the adulteration.

139.   In furtherance of Defendants' conspiracies and schemes, the Packer Defendants engaged in repetitious and systematic mail fraud and interstate and foreign wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by using or causing the use of private or commercial interstate carriers and wires in interstate and foreign commerce to repeatedly, systematically, and distribute fake honey to retailers and other businesses throughout the United States.

140.   Specifically, to hide their malfeasance and further the scheme, the Packer Defendants created, maintained, and transmitted through the mail and wires fake and fraudulent bills of lading, invoices, packing lists, and other papers to fraudulently represent fake honey as genuine. This includes at least bills of lading, invoices, delivery orders, warehouse receipts, EA-IRMS Reports, HRMS reports, and NMR reports.

## V.    DEFENDANTS' SCHEME HARMED THE MARKET AND INJURED PLAINTIFFS AND OTHER DOMESTIC COMMERCIAL BEEKEPERS

141.   By conspiring to import and sell fake honey as genuine honey, Defendants have caused great harm to the market for honey, and to Plaintiffs and other domestic commercial beekeepers ("Class Members").

142.   Defendants caused fake honey to enter the United States' honey market at substantially lower prices than the fair market price of the genuine honey produced and sold by Plaintiffs and other Class Members, putting them in a position where they could not compete with Defendants.

143.   Because the demand for genuine honey is higher than the available supply, had Defendants not engaged in the acts of fraud alleged herein, packers and retailers would have had to purchase genuine honey from honest beekeepers, including Plaintiffs and other Class Members, in order to meet consumer demand without resorting to buying fake honey.

144.   It was a foreseeable and natural consequence of Defendants' fraudulent conduct and scheme to obtain greater sales for themselves that Plaintiffs and other Class Members would sell less genuine honey or be forced to sell their genuine honey at prices significantly below what a fair market price would be absent Defendants' wrongful and unlawful conduct.

145.   As a direct and proximate result of Defendants' wrongful and unlawful conduct, Plaintiffs and other Class Members lost genuine honey sales to Defendants or had to sell their genuine honey at deeply-discounted prices, eliminating or severely impeding their ability to make a profit. Additionally, Valor Honey has been unable to adequately sustain its benevolent and therapeutic training mission.

146.   Plaintiffs and other Class Members thus suffered immediate injury to their businesses and property in the form of, *inter alia*, lost sales and profits.

147.   For example, Plaintiff Bullfrog Bees is unable to get a fair price for the genuine honey it produces and cannot even break even, *i.e.*, sell its honey for its cost of production. As a result, Bullfrog Bees has been forced to sell its genuine honey only to local retailers, leaving it without the ability to grow the number of hives it maintains, increase the amount of honey it produces, or otherwise grow its business.

148.   Similarly, despite its long-term budget and business planning being based on its expectation of obtaining a fair market rate for its genuine honey, Valor Honey is unable to compete with the low price at which Defendants sell their fake honey, and, as a result of Defendants' wrongful and unlawful conduct, cannot even break even when selling its honey.

43

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

This is because nearly every mass retailer in the United States, including Costco, Walmart, Trader Joes, and Albertson's, is unwilling to pay a fair price for Valor Honey's honey and has refused to do business with Valor Honey because the price of its genuine honey is too high compared to the price of Defendants' fake honey.

149.   Moreover, Adee Honey Farms—the largest honey production farm in the country—has been forced to sell its genuine honey at a substantially lower-than-break-even price, and often cannot sell its honey *at all*. Given that genuine honey production has decreased, and consumer demand increased, Adee should have no problem selling its honey, and for a fair price. Yet, Adee is currently storing over *6 million pounds* of honey it has been unable to sell because Defendants and other potential customers will not buy it when they can instead purchase for a lesser price fake honey that is True Source Certified.

150.   There is a direct causal relationship between Defendants' fraudulent importing, false certification as genuine, and selling of fake honey, and their attaining a superior competitive position in the market vis-à-vis Plaintiffs and other Class Members, with the latter suffering the above-described economic damages.

## CLASS ALLEGATIONS

151.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Nationwide Class of all U.S. domestic commercial beekeepers—and a California Subclass of all California commercial beekeepers—that, on or after March 29, 2017 (the "Class Period"), produced or sold honey in the United States (the "Class").

152.   Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Class Period may be expanded or narrowed by amendment to the Complaint or in a motion for class certification, including through the use of additional Subclasses if appropriate.

153.   Class Members were uniformly impacted by Defendants' misconduct. Accordingly, this Complaint is suitable for class-wide resolution.

154.   This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(l)-(4) and 23(b)(l), (b)(2) or (b)(3),

1  and satisfies the requirements thereof. If appropriate, Plaintiffs may also seek certification of
2  specific issues pursuant to Fed. R. Civ. P. 23(b)(4).

3  **I.      RULE 23(A) REQUIREMENTS**

4         155.   The Class satisfies the numerosity, commonality, typicality, adequacy,
5  predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and
6  (b)(3).

7         156.   **Numerosity**: The proposed Class is so numerous that joinder of all members
8  would be impracticable.  While the exact number of Class Members is unknown at this time,
9  Plaintiff believes the Class is comprised of at least several thousand domestic commercial
10  beekeepers.

11         157.   **Typicality**: Plaintiffs' claims are typical of the claims of other Class Members'
12  claims. Plaintiffs and other Class Members sustained and continue to sustain damages arising
13  out of Defendants' conduct in violation of the laws alleged herein.

14         158.   **Adequacy of Representation**: Plaintiffs are adequate representatives of the
15  Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed
16  to the vigorous prosecution of this action and have retained competent counsel, experienced
17  in litigation of this nature, to represent them and the Class. There are no conflicts between
18  Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the
19  management of this litigation as a class action.

20         159.   **Commonality**: There are numerous and substantial questions of law and fact
21  common to all Class Members sufficient to satisfy Rule 23(a), which control this litigation
22  and predominate over any individual issues for purposes of Rule 23(b)(3). Included within
23  these common questions are the following:

24              a.     Whether the Importer Defendants imported fake honey into the United
25  States for purchase by businesses and other persons in the United States;

26              b.     Whether the Packer Defendants engaged in the repackaging and
27  distribution of fake honey for sale in the retail market;

28              c.     Whether the Certifier Defendants falsely certified as genuine the fake

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

honey sold by the Importer Defendants and Packer Defendants;

        d.    Whether Defendants, by their conduct, conspired to violate or actually violated RICO;

        e.    Whether Defendants, by their conduct, violated the Sherman Act;

        f.    Whether Defendants, by their conduct, violated the Cartwright Act;

        g.    Whether Defendants, by their conduct, violated the California Unfair Competition Law;

        h.    Whether Defendants' conduct caused injury to the business or property of Plaintiffs and other Class Members;

        i.    The appropriate measure of damages sustained by Plaintiffs and other Class Members, or the amount of restitution due to them; and

        j.    The appropriate injunctive relief.

## II.   RULE 23(B)(2) REQUIREMENTS

160.   Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

161.   Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendants. Money alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to import, certify as genuine, and sell fake honey in the United States' honey market.

## III.   RULE 23(B)(3) REQUIREMENTS

162.   **Predominance**: As set forth herein, common issues of fact and law predominate because Plaintiffs' claims are based on a common course of conduct by Defendants. Whether Defendants' conduct violates RICO, the Sherman Act, the Cartwright Act, and the UCL are questions common to all Class Members and the predominating issues in this litigation, and

46

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

163. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. Given the size of the claims of individual Class Members, as well as the resources of Defendants, few Class Members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b. This action will permit an orderly and expeditious administration of the Class Members' claims, will foster economies of time, effort, and expense, and will ensure uniformity of decisions;

c. Any interest of Class Members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system;

d. Without a class action, Class Members will continue to suffer damages, Defendants' violations of law will proceed without remedy, and Defendants will continue to reap and retain the substantial proceeds derived from their wrongful and unlawful conduct;

e. This action presents no difficulties that will impede its management by the Court as a class action; and

f. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

## I.  FIRST CAUSE OF ACTION - VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962(C)

164. Plaintiffs incorporate by reference the allegations of the preceding paragraphs, as though fully set forth herein.

165. Plaintiffs and the Class bring this claim against Defendants for relief pursuant to

47

18 U.S.C. §§ 1962(c) & 1964(c) of RICO.

166.    Plaintiffs and other Class Members are "persons" as that term is defined in 18 U.S.C. § 1961(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

167.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), because they are entities capable of holding legal or beneficial interest in property.

168.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise generally has three structural features, including: (a) a purpose; (b) relationships among those associated with the enterprise; and (c) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

169.    Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

170.    Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

171.    As alleged below and throughout this Complaint, Defendants orchestrated a scheme to deprive Plaintiffs and the Class of money or property by flooding the United States' honey market with fake honey, which they pass off as genuine. Defendants conducted their business through an association-in-fact enterprise in violation of § 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of enabling Defendants to enjoy massive profits and prevent domestic commercial beekeepers, like Plaintiffs and other Class Members, from being able to survive, let alone compete.

172. Defendants' endeavor had the desired effect. Defendants secured unlawful profits during the pendency of the enterprise, while Plaintiffs and other Class Members suffered injury to their business and property in the form of, *inter alia*, lost sales and lost profits.

**A.    The Certifier-Importer Enterprise**

173. The Certifier Defendants (True Source, Intertek, and NSF) and Importer Defendants (Sunland, Lamex, and Odem) formed an association-in-fact enterprise, referred to as the "Certifier-Importer Enterprise."

174. The Certifier-Importer Enterprise included: (a) the Importer Defendants, their subsidiaries, employees, and agents; and (b) the Certifier Defendants, their subsidiaries, employees, and agents.

175. The Certifier-Importer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminating Plaintiffs and other Class Members as competitors by selling fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) generally undermining the credibility and economics of the domestic honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

176. Each member of the Certifier-Importer Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

177. Each member of the Certifier-Importer Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But the enterprise and each member thereof (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and

49

entities, including unknown third parties.

178.   The patterns of racketeering activity alleged herein are separate and distinct from each other. Likewise, the Certifier Defendants and Importer Defendants are distinct from the Certifier-Importer Enterprise, and they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, individual personhood, reporting requirements, and financial statements.

179.   The members of the Certifier-Importer Enterprise are systematically linked through continually-coordinated activities, financial ties, and contractual business arrangements, and the Certifier-Importer Enterprise is ongoing and continuing.

180.   Neither the Certifier Defendants nor the Importer Defendants could have accomplished the purpose of the Certifier-Importer Enterprise without the assistance of the other, and each of the Defendants profited financially from the scheme.

181.   The members of the Certifier-Importer Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

182.   The Certifier-Importer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling fake honey, or providing fraudulent testing and auditing to assist in the distribution and sale of fake honey for purchase by businesses and consumers in the United States.

183.   As a result of the Certifier-Importer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey at a loss, to the extent they can sell it at all, and in some instances have been unable to sell their honey to large retailers, which are unwilling to pay a fair price for their genuine honey because they can purchase for far less fake honey that is True Source Certified as genuine.

### 1.   Conduct of the Enterprise

184.   The Certifier Defendants and Importer Defendants exerted control over the Certifier-Importer Enterprise and participated in the operation and management of its affairs, directly and indirectly.

185.   Certifier Defendants participated in the operation and management of the enterprise by: (a) in the case of Intertek, knowingly and intentionally providing fraudulent testing to obscure the adulteration of honey by the Importer Defendants; (b) in the case of NSF, knowingly and intentionally providing fraudulent audits and audit reports to obscure the adulteration of honey by the Importer Defendants; and (c) in the case of True Source, knowingly and intentionally allowing the Importer Defendants to use the True Source Certified Seal to falsely represent their fake honey as genuine honey.

186.   The Importer Defendants participated in the operation and management of the enterprise by distributing and selling fake honey for purchase by businesses and consumers in the United States.

### 2.    Pattern of Racketeering Activity of the Enterprise

187.   The Certifier Defendants and Importer Defendants carried out their scheme through a pattern of racketeering activity that caused the use of private or commercial interstate carriers or the wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute fake honey to businesses and persons throughout the United States.

188.   Defendants' predicate acts of racketeering activity, *see* 18 U.S.C. § 1961(1)(B), include, but are not limited to:

a.    **Mail Fraud**: The Certifier Defendants and Importer Defendants violated 18 U.S.C. § 1341 by sending and receiving, or causing to be sent and received, materials via commercial interstate carriers, for the purpose of executing their unlawful and fraudulent scheme to profit from the sale of fake honey.

b.    **Wire Fraud**: The Certifier Defendants and Importer Defendants violated 18 U.S.C. § 1343 by transmitting and receiving, or by causing to be transmitted and received, materials by wire for the purpose of executing their unlawful and fraudulent scheme to profit from the sale of fake honey.

189.   The Certifier-Importer Enterprise's pattern of racketeering likely involved thousands of separate instances in which commercial interstate carriers and interstate wire

51

facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering, including mail and wire fraud, as Defendants' business is conducted through the creation of numerous records that are necessary to perpetrate the fraud.

190.    Many of the precise dates of Defendants' fraudulent use of interstate carriers or interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. Plaintiffs have, however, described the types of predicate acts of mail and wire fraud that occurred. They include fraudulent purchase orders, bills of lading, invoices, packing lists, certificates of analysis, audit reports, and other papers that have been used to fraudulently declare the Importers' fake honey to be genuine, as well as the use of the True Source Certified Seal to falsely represent their fake honey to be genuine.

191.    The Certifier Defendants and Importer Defendants knew and intended that businesses and other persons would rely on their material misrepresentations and would be misled into purchasing the Importer Defendants' fake honey believing it to be genuine honey.

192.    The Certifier Defendants and Importer Defendants knew and intended that the introduction of fake honey into the United States' honey market would: (a) suppress the price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminate Plaintiffs and other Class Members as competitors by selling fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; (d) undermine the credibility and economics of the domestic honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

193.    Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Certifier Defendants and Importer Defendants intended to and did defraud purchasers of the Importer Defendants' fake honey, to the financial detriment of Plaintiffs and other Class Members.

### 3. Damages

194.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs and other Class Members injury in their business and property because Plaintiffs and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' wrongful and unlawful conduct.

195.   Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey, misrepresented as genuine, to businesses and other persons throughout the United States.

196.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

### B. The Certifier-Packer Enterprise

197.   The Packer Defendants (Barkman and Dutch Gold) and the Certifier Defendants (True Source, Intertek, and NSF) formed an association-in-fact enterprise, referred to as the "Certifier-Packer Enterprise."

198.   The Certifier-Packer Enterprise included: (a) the Packer Defendants, their subsidiaries, employees, and agents; and (b) the Certifier Defendants, their subsidiaries, employees, and agents.

199.   The Certifier-Packer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminating Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could sell genuine honey profitably; and (d) generally undermining the credibility and economics of the domestic genuine honey market to their financial benefit and the financial detriment of Plaintiffs and other Class Members.

200.   Each member of the Certifier-Packer Enterprise was aware of the enterprise's

purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

201.   Each member of the Certifier-Packer Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

202.   The patterns of racketeering activity alleged herein are separate and distinct from each other. Likewise, the Packer Defendants and the Certifier Defendants are distinct from the Certifier-Packer Enterprise, and they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, individual personhood, reporting requirements, and financial statements.

203.   The members of the Certifier-Packer Enterprise are systematically linked through continually-coordinated activities, financial ties, and contractual business arrangements, and the Certifier-Packer Enterprise is ongoing and continuing.

204.   Neither the Packer Defendants nor the Certifier Defendants could have accomplished the purpose of the Certifier-Packer Enterprise without the assistance of the other and profited financially from the scheme.

205.   The members of the Certifier-Packer Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

206.   The Certifier-Packer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling fake honey mislabeled as genuine for purchase by businesses and consumers in the United States.

207.   As a result of the Certifier-Packer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey at a loss, to the extent they can sell it all, and in

1  some instances have been unable to sell their honey to large retailers, which are unwilling to
2  pay a fair price for their genuine honey because they can purchase for far less fake honey that
3  is True Source Certified as genuine.

4    **1.    Conduct of the Enterprise**

5    208.   The Packer Defendants and the Certifier Defendants exerted control over the
6  Certifier-Packer Enterprise and participated in the operation and management of its affairs,
7  directly and indirectly.

8    209.   The Packer Defendants participated in the operation and management of the
9  enterprise by knowingly and intentionally distributing and selling fake honey, represented to
10 be genuine, for purchase by retailers and other businesses in the United States.

11   210.   The Certifier Defendants participated in the operation and management of the
12 enterprise by knowingly and intentionally certifying the Packer Defendants' fake honey as
13 genuine honey or providing fraudulent testing or auditing to obscure that the Packer
14 Defendants' fake honey is adulterated.

15   **2.    Pattern of Racketeering Activity of the Enterprise**

16   211.   The Packer Defendants and the Certifier Defendants carried out their scheme
17 through a pattern of racketeering activity that caused the use of private or commercial
18 interstate carriers and/or the wires in interstate and foreign commerce to repeatedly,
19 systematically, and fraudulently distribute fake honey to businesses and persons throughout
20 the United States.

21   212.   Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B))
22 include, but are not limited to:

23        a.     **Mail Fraud**: The Packer Defendants and the Certifier Defendants
24        violated 18 U.S.C. § 1341 by sending and receiving, or causing to be sent and received,
25        materials via commercial interstate carriers, for the purpose of executing the unlawful
26        and fraudulent scheme to profit from the sale of fake honey.

27        b.     **Wire Fraud**: The Packer Defendants and the Certifier Defendants
28        violated 18 U.S.C. § 1343 by transmitting and receiving, or by causing to be transmitted

1  and received, materials by wire for the purpose of executing the unlawful and
2  fraudulent scheme to profit from the sale of fake honey.

3  213.  The Certifier-Packer Enterprise's pattern of racketeering likely involved
4  thousands of separate instances in which commercial interstate carriers or interstate wire
5  facilities were knowingly and intentionally used to further the enterprise's pattern of
6  racketeering, including mail and wire fraud, as Defendants' business is conducted through
7  the creation of numerous records that are necessary to perpetrate the fraud.

8  214.  Many of the precise dates of Defendants' fraudulent use of interstate carriers or
9  interstate wire facilities have been deliberately hidden and cannot be alleged without access
10 to Defendants' books and records.

11 215.  Plaintiffs have, however, described the types of predicate acts of mail and wire
12 fraud that occurred. They include the Packer Defendants' fraudulent purchase orders, bills of
13 lading, invoices, packing lists, certificates of analysis, audit reports, and other papers that
14 have been used to fraudulently certify and declare the Packer Defendants' fake honey to be
15 genuine.

16 216.  The Packer Defendants and the Certifier Defendants knew, and intended that,
17 businesses and other persons would rely on the material misrepresentations made by them
18 and would be misled into purchasing the Packer Defendants' fake honey products, falsely
19 believing them to be genuine honey.

20 217.  The Packer Defendants and the Certifier Defendants knew and intended that
21 their introduction of fake honey into the United States' honey market would (a) suppress the
22 price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to
23 themselves that otherwise would have been made by Plaintiffs and other Class Members; (c)
24 eliminate Plaintiffs and other Class Members as competitors by selling the fake honey at
25 substantially lower prices than the prices at which Plaintiffs and other Class Members could
26 sell genuine honey profitably; and (d) undermine the credibility and economics of the
27 domestic genuine honey market to their financial benefit and to the financial detriment of
28 Plaintiffs and other Class Members.

1
2
3
4
5
6

218.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Importer Defendants and the Certifier Defendants intended to and did defraud purchasers of the Packer Defendant's fake honey, to the financial detriment of Plaintiffs and other Class Members.

7

### 3.   Damages

8
9
10
11

219.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs' and other Class Members' injury in their business and property because Plaintiffs and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' conduct.

12
13
14

220.   Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey to businesses and other persons throughout the United States.

15
16
17

221.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

18

### C.   The Importer-Packer Enterprise

19
20
21

222.   The Importer Defendants (Sunland, Lamex, and Odem) and Packer Defendants (Barkman and Dutch Gold) formed an association-in-fact enterprise, referred to as the "Importer-Packer Enterprise."

22
23
24

223.   The Importer-Packer Enterprise included: (a) the Packer Defendants, their subsidiaries, employees, and agents; and (b) the Importer Defendants, their subsidiaries, employees, and agents.

25
26
27
28

224.   The Importer-Packer Enterprise was formed for the purpose of: (a) suppressing the price of genuine honey in the domestic honey market; (b) diverting sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and the Class; (c) eliminating Plaintiffs and the Class as competitors by selling the fake honey at substantially

57

1 lower prices than the prices at which Plaintiffs and other Class Members could sell genuine
2 honey profitably; and (d) generally undermining the credibility and economics of the
3 domestic honey market to their financial benefit and the financial detriment of Plaintiffs and
4 other Class Members.

5        225.   Each member of the Importer-Packer Enterprise was aware of the enterprise's
6 purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each
7 member of the enterprise reaped substantial profits from the conduct of the enterprise.

8        226.   Each member of the Importer-Packer Enterprise acquired, maintained control of,
9 was associated with, and conducted or participated in the conduct of the enterprise's affairs.
10 But the enterprise, and each member thereof: (a) had an existence separate and distinct from
11 each of its members; (b) was separate and distinct from the pattern of racketeering in which
12 the Defendants engaged; and (c) was an ongoing and continuing organization consisting of
13 legal entities, including the Defendants, along with other individuals and entities, including
14 unknown third parties.

15        227.   The patterns of racketeering activity alleged herein are separate and distinct from
16 each other. Likewise, the Importer Defendants and the Packer Defendants are distinct from
17 the Importer-Packer Enterprise, and they have a separate existence from the enterprise,
18 including distinct legal statuses, different offices and roles, individual personhood, reporting
19 requirements, and financial statements.

20        228.   The members of the Importer-Packer Enterprise are systematically linked
21 through continually-coordinated activities, financial ties, and contractual business
22 arrangements, and the Importer-Packer Enterprise is ongoing and continuing.

23        229.   Neither the Importer Defendants nor the Packer Defendants could have
24 accomplished the purpose of the Importer-Packer Enterprise without the assistance of the
25 other and profited financially from the scheme.

26        230.   The members of the Importer-Packer Enterprise functioned as a continuing unit
27 for the purposes of implementing the scheme, and each agreed to take actions to hide the
28 existence of the scheme, as well as the controlling association-in-fact enterprise from others.

58

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

231.   The Importer-Packer Enterprise engaged in and affected interstate commerce by, *inter alia*, distributing and selling fake honey mislabeled as genuine for purchase by businesses and consumers in the United States.

232.   As a result of the Importer-Packer Enterprise, Plaintiffs and other Class Members have been forced to sell their genuine honey at a loss, to the extent they can sell it at all, and in some instances have been unable to sell their honey to large retailers, which are unwilling to pay a fair price for their genuine honey because they can purchase for far less fake honey that is True Source Certified as genuine.

### 1.     Conduct of the Enterprise

233.   The Importer Defendants and the Packer Defendants exerted control over the Importer-Packer Enterprise and participated in the operation and management of its affairs, directly and indirectly.

234.   The Importer Defendants participated in the operation and management of the enterprise by knowingly and intentionally importing and selling fake honey for purchase by businesses and consumers in the United States.

235.   The Packer Defendants participated in the operation and management of the enterprise by knowingly and intentionally purchasing from the Importer Defendants, distributing, and selling fake honey, misrepresented as genuine, for purchase by retailers and other businesses in the United States.

### 2.     Pattern of Racketeering Activity of the Enterprise

236.   The Importer Defendants and the Packer Defendants carried out their scheme through a pattern of racketeering activity that caused the use of private or commercial interstate carriers and/or the wires in interstate and foreign commerce to repeatedly, systematically, and fraudulently distribute fake honey to businesses and persons throughout the United States.

237.   Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) include, but are not limited to:

    a.     **Mail Fraud**: The Importer Defendants and the Packer Defendants

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

violated 18 U.S.C. § 1341 by sending and receiving, or causing to be sent and received, materials via commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

      b.   **Wire Fraud**: The Importer Defendants and the Packer Defendants violated 18 U.S.C. § 1343 by transmitting and receiving, or by causing to be transmitted and received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from the sale of fake honey.

238.   The Importer-Packer Enterprise's pattern of racketeering likely involved thousands of separate instances in which commercial interstate carriers or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering, including mail and wire fraud, as Defendants' business is conducted through the creation of numerous records that are necessary to perpetrate the fraud.

239.   Many of the precise dates of Defendants' fraudulent use of interstate carriers or interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

240.   Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud that occurred. They include the Defendants' fraudulent purchase orders, bills of lading, invoices, packing lists, certificates of analysis, audit reports, and other papers that have been used to falsely and fraudulently declare their fake honey to be genuine.

241.   The Importer Defendants and the Packer Defendants knew and intended that businesses and other persons would rely on their material misrepresentations and would be misled into purchasing the Defendants' fake honey believing it to be genuine honey.

242.   The Importer Defendants and the Packer Defendants knew and intended that their introduction of fake honey into the United States' honey market would (a) suppress the price of genuine honey in the domestic honey market; (b) divert sales, revenue, and profits to themselves that otherwise would have been made by Plaintiffs and other Class Members; (c) eliminate Plaintiffs and other Class Members as competitors by selling the fake honey at substantially lower prices than the prices at which Plaintiffs and other Class Members could

sell genuine honey profitably; and (d) undermine the credibility and economics of the domestic genuine honey market to their financial benefit and to the financial detriment of Plaintiffs and other Class Members.

243.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which the Importer Defendants and the Packer Defendants intended to and did defraud purchasers of the Defendants' fake honey, to the financial detriment of Plaintiffs and other Class Members.

### 3.   Damages

244.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs' and other Class Members' injury in their business and property because Plaintiffs and other Class Members lost honey sales and profits they would have otherwise made absent Defendants' conduct.

245.   Defendants continue to harm domestic commercial beekeepers such as Plaintiffs and other Class Members by continuing their international scheme of distributing and selling fake honey to businesses and other persons throughout the United States.

246.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## II.   SECOND CAUSE OF ACTION - CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D)

247.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs, as though fully set forth herein.

248.   Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

249.   Defendants knew they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

250.   Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the enterprises described above through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

251.   Each of the Defendants knew about and agreed to facilitate the scheme to injure Plaintiffs and other Class Members in their business and property through the wrongful and unlawful acts identified herein. It was part of the conspiracy that Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the enterprises described above, including the acts of racketeering set forth herein.

252.   As a direct and proximate result of Defendants' conspiracy, the acts of racketeering activity of the enterprises described above, the overt acts taken in furtherance of that conspiracy, and Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and other Class Members have been injured in their business and property, as set forth above.

253.   Plaintiffs seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages, attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## III.   THIRD CAUSE OF ACTION - VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

254.   Plaintiffs incorporate and reallege, as though fully set forth herein, the allegations set forth in the preceding paragraphs of this Complaint.

255.   The relevant market is the United States honey market, including products purporting to be genuine honey (for example, corn syrup labeled and sold as if it were genuine honey), but excluding non-honey sweeteners that are ***not*** being passed off as honey (for example, corn syrup labeled and sold as corn syrup).

256.   Defendants have substantial market power in the United States honey market. Each has a dominant share in the market:

a.   Sunland has been "the leading US importer of honey" "[f]or more than 40 years."[53]

b.   Lamex has "been active in the honey industry for the last decade and ha[s] grown to become a major trader in the world honey market." It "buy[s] approximately 30,000 tonnes pa of bulk honey from all major historical honey producing countries around the world."[54] Lamex is thus "a major trader of bulk honey in the U.S."[55]

c.   Odem is "a leader in bulk raw honey imports in Northern America,"[56] and "the cement binding honey producers to honey processors by building an effective supply chain all around the world."[57]

d.   Barkman is one of the "key market players" in the honey industry according to a report on the Honey Food Market 2020.[58]

e.   Dutch Gold is "the largest independent honey packaging business in the country."[59]

f.   True Source "has more than 750 members including beekeepers, honey importers, exporters and packers," and "[a]n estimated 40 percent of honey sold in the United States . . . is True Source Certified."[60]

---

[53] http://www.sunlandhoney.com

[54] http://www.lamexfoods.eu/index.php/honey/honey

[55] https://honey.com/honey-locator/profile/lamex-foods-inc

[56] https://www.odeminternational.com/the-company

[57] https://www.odeminternational.com/the-markets

[58] https://tinyurl.com/3275ex3h (also listing Lamex as a top player in the honey industry).

[59] https://www.dutchgoldhoney.com/about-us

[60] https://truesourcehoney.com/participating-companies


g.     NSF performs auditing services on behalf of True Source and thus performs auditing services for "40 percent of honey sold in the United States."[61]

h.     Intertek performs testing services on behalf of True Source and thus performs testing services for "40 percent of honey sold in the United States.[62]

257.   During the Class Period and continuing today, Defendants exercised this power to flood the honey market with mislabeled and adulterated fake honey, and to depress prices for genuine honey. Defendants' combined efforts have made it impossible for domestic producers of genuine honey, like Plaintiffs and other Class Members, to compete.

258.   To bring honey from farm to market, beekeepers rely on a limited number of packers to undertake the labor and expense of processing, packaging, and marketing their genuine honey. Moreover, there is not enough domestic genuine honey supply to meet demand in the United States honey market, such that reliance on imported honey is necessary. Defendants use these circumstances to manipulate the market by certifying and importing fake honey, depriving Plaintiffs and other Class Members of free and open competition, and depressing the price of genuine, bee-made honey.

259.   Defendants' anticompetitive conduct has flooded the United States honey market with fake honey, thereby creating a false increase in supply, and has suppressed the market price for genuine, bee-made honey. Plaintiffs and other Class Members have thus been deprived of free and open competition.

260.   True Source openly acknowledges that fake honey "threatens the U.S. honey industry *by undercutting fair market prices* and damaging honey's reputation for quality and safety."[63]

261.   By reason of these violations of the antitrust laws, Plaintiffs and other Class Members have sustained injury to their businesses or property, having been paid lower prices

---

[61] *Id.*

[62] *Id.*

[63] https://truesourcehoney.com (emphasis added)

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

for their genuine honey than they would have otherwise been paid, and sold less genuine honey than they would otherwise have sold absent Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

262.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

263.   Beginning at least as early as July 2010, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially depress prices for genuine honey in the United States, in violation of Section I of the Sherman Antitrust Act, 15 U.S.C. § 1.

264.   In formulating and carrying out the agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do to depress the price of genuine honey. The combination and conspiracy has had the following effects, among others:

a.   Price competition in the purchase of genuine honey has been restrained, suppressed, and/or eliminated in the United States;

b.   Prices for genuine honey purchased by Defendants and their co-conspirators have been depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States; and

c.   Those who sold their genuine honey directly to Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

265.   Plaintiffs and other Class Members have been injured and will continue to be injured in their businesses and property by being paid less for genuine honey that they sell than they otherwise would have been paid, and by selling less genuine honey than they otherwise would have sold, absent the combination and conspiracy by Defendants and their co-conspirators.

266.   Plaintiffs and members other Class Members seek and are entitled to damages and an injunction against Defendants preventing and restraining the violations alleged herein.

1  **IV.  FOURTH CAUSE OF ACTION - VIOLATIONS OF THE CALIFORNIA**
2  **CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720**

3       267.    Plaintiff Bullfrog Bees incorporates by reference the allegations of the preceding
4  paragraphs, as though fully set forth herein.

5       268.    As described herein, Defendants and their co-conspirators entered into and
6  engaged in a continuing unlawful trust, combining their capital, skills, and acts for the
7  purpose of creating and carrying out restrictions of trade and commerce.

8       269.    As a direct and proximate result of Defendants' unlawful conduct, Bullfrog Bees
9  and other California Subclass Members were injured in their business and property in that
10  they were unable to sell their genuine honey at fair market prices.

11       270.    As a result of Defendants' violation of section 16720, Bullfrog Bees brings this
12  claim pursuant to Cal. Bus. & Prof. Code § 16750(c) seeking all relief as allowed by law,
13  including *inter alia*, actual damages and treble damages, attorney's fees, all costs and
14  expenses of suit, and pre- and post-judgment interest.

15  **V.   FIFTH CAUSE OF ACTION, VIOLATIONS OF THE UNFAIR**
16  **COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ*.**

17       271.    Plaintiff Bullfrog Bees incorporates by reference the allegations of the preceding
18  paragraphs, as though fully set forth herein.

19       272.    Bullfrog Bees brings this claim for relief under the "unfair," "fraudulent," and
20  "unlawful" prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code
21  §§ 17200 *et seq*., on behalf of itself and other California Subclass Members, all of whom
22  were subject to Defendants' above-described unlawful conduct.

23       273.    Bullfrog Bees has standing to pursue this claim as it has suffered injury in fact
24  and has lost money or property as a result of Defendants' conduct described herein.
25  Specifically, Defendants distributed and sold their fake honey at substantially lower market
26  prices than the genuine honey produced and sold by Bullfrog Bees, placing Bullfrog Bees in
27  positions where it could not compete. As a result of Defendants' conduct, Bullfrog Bees has
28  lost honey sales and profits it otherwise would have made absent Defendants' conduct.

### A.   Defendants' "Unfair" Conduct

274.   Defendants' business practices, as alleged herein, are unfair because: (a) the injury to the consumer is substantial; (b) the injury is not outweighed by any countervailing benefits to consumers or competition; and (c) consumers could not reasonably have avoided the injury because Defendants misled the consuming public through their own misrepresentations and omissions.

275.   Defendants' business practices are also unfair because their conduct described herein is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and the gravity of the harm to consumers is not outweighed by the utility of Defendants' conduct.

276.   Defendants' business practices are also unfair because they undermine public policy, which is tethered to specific constitutional and statutory provisions, including at least RICO, the Sherman Antitrust Act, and the Cartwright Act.

### B.   Defendants' "Unlawful" Conduct

277.   Defendants' conduct was "unlawful" within the meaning of the UCL because, as alleged herein, it violated RICO, the Sherman Antitrust Act, and the Cartwright Act. In addition, Defendants' conduct in labeling fake honey with True Source Certified Seal indicating that the product is genuine violates the Federal Food, Drug, and Cosmetic Act, which renders misbranded any food whose "labeling is in any particular," 21 U.S.C. § 343(a).

### C.   The Class was Injured by Defendants' UCL Violations

278.   Bullfrog Bees and other California Subclass Members suffered injury in fact and lost money or property as a result of Defendants' actions as set forth herein. By engaging in the unfair, fraudulent, and unlawful conduct described above, Defendants have: (a) suppressed the price of genuine honey in the domestic honey market; (b) diverted sales, revenue, and profits to themselves that otherwise would have been made by Bullfrog Bees and other California Subclass Members; (c) eliminated Bullfrog Bees and other California Subclass Members as competitors by selling the fake honey at substantially lower prices than the prices at which they could sell genuine honey profitably; and (d) undermined the

credibility and economics of the domestic genuine honey market to their financial benefit and Bullfrog Bees' and other California Subclass Members' financial detriment.

279.   Defendants' wrongful business practices constitute a continuing course of conduct of unfair competition since Defendants continue to distribute and sell fake honey as genuine to businesses and other persons throughout the United States.

280.   Bullfrog Bees' legal remedies are inadequate because, pursuant to section 17203 of the UCL, Bullfrog Bees seeks restitution, which may be measured differently than damages, and an Order of this Court enjoining Defendants from engaging in the unfair and unlawful business practices alleged herein in connection with the distribution and sale of fake honey to businesses and other persons throughout the United States.

## VI.   SIXTH CAUSE OF ACTION - UNJUST ENRICHMENT

281.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs, as though fully set forth herein.

282.   By their wrongful acts described herein, Defendants were unjustly enriched at the expense of Plaintiffs and other Class Members.

283.   It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct.

284.   Plaintiffs, on behalf of themselves and other Class Members, seek restitution from Defendants, and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants, including relief as follows:

A.   An Order certifying the proposed Class, appointing Plaintiffs and their Counsel to represent the Class, and directing Defendants to pay the cost of Class Notice;

B.   An Order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

C.     An Order declaring Defendants to have conspired to violate and in fact violated the Racketeering Influenced Corrupt Practices Act, the Sherman Antitrust Act, the California Cartwright Act, and the California Unfair Competition Law, and declaring that Defendants were unjustly enriched;

D.     Compensatory damages and restitution for economic loss and out-of-pocket costs, treble damages, and punitive and exemplary damages allowed under applicable law;

E.     Pre- and post-judgment interest on any amounts awarded;

F.     Attorneys' fees and costs; and

G.     Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues in this action so triable.

Dated:  March 28, 2022                    By:   _/s/ Melanie Persinger_____
                                              Melanie Persinger

                                          **MILSTEIN JACKSON
                                          FAIRCHILD & WADE, LLP**
                                          Gillian L. Wade, State Bar No. 229124
                                          *gwade@mjfwlaw.com*
                                          Sara D. Avila, State Bar No. 263213
                                          *savila@mjfwlaw.com*
                                          Marc A. Castaneda, State Bar No. 299001
                                          *mcastaneda@mjfwlaw.com*
                                          10990 Wilshire Blvd., 8th Floor
                                          Los Angeles, California 90024
                                          Phone: (310) 396-9600

                                          **REESE LLP**
                                          Michael R. Reese, State Bar No. 206773
                                          *mreese@reesellp.com*
                                          100 West 93rd Street, 16th Floor
                                          New York, New York 10025
                                          Phone: (212) 643-0500

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT

Carlos F. Ramirez (*pro hac vice* to be filed)
*cramirez@reesellp.com*
7 Skyline Drive
Hawthorne, New York 10532
Phone: (914) 860-4994

**FITZGERALD JOSEPH LLP**
Jack Fitzgerald (SBN 257370)
*jack@fitzgeraldjoseph.com*
Paul K. Joseph (SBN 287057)
*paul@fitzgeraldjoseph.com*
Melanie Persinger (SBN 275423)
*melanie@fitzgeraldjoseph.com*
Trevor M. Flynn (SBN 253362)
*trevor@fitzgeraldjoseph.com*
Caroline S. Emhardt (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
Fax: (619) 331-2943

***Counsel for Plaintiffs***

*Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-00582-TLN-CKD
SECOND AMENDED CLASS ACTION COMPLAINT